# WILLIAM EDWARD SPEARS, ET AL.
### *v.*
## EDWIN H. HONDA, ET AL.

## No. 4754.

December 12, 1968.

RICHARDSON, C.J., MARUMOTO AND ABE, JJ., CIRCUIT JUDGE FUKUOKA FOR LEVINSON, J., DISQUALIFIED, AND CIRCUIT JUDGE HAWKINS BY REASON OF VACANCY.

2

OPINION OF THE COURT BY RICHARDSON, C.J.

Plaintiffs-appellants, minors attending the public schools, brought suit through their guardians ad litem, taxpayers in the City and County of Honolulu, to challenge the use of public funds to provide bus transportation subsidies to sectarian and private school students under Act 97, S.L.H. 1965; Act 233, S.L.H. 1967; and Rule 1 of the State School Board issued pursuant to Act 233. Appellants, seeking a declaratory judgment and injunctive relief, assert, among other things, that the acts and the rule violate Article IX, Section 1, of the Constitution of the State of Hawaii, which provides that no public funds shall be "appropriated for the support or benefit of any sectarian or private educational institution."

## I.

Before proceeding to the merits of the case, we must review the legislative acts and the rule in dispute.

Under Act 97, which took effect on July 1, 1965, the State assumed responsibility for several governmental

functions previously delegated to the various county governments, including "the transportation of school children." Act 97, §§ 1, 13. During fiscal 1967, the sum of $54,610.70 was disbursed by the State Comptroller for transportation of both public and nonpublic school students under authority purportedly granted by Act 97.

Under Act 233, effective on June 6, 1967, the Legislature authorized the State Department of Education "to provide suitable transportation for *all school children* in grades kindergarten to 12 and in special education classes [classes comprised of handicapped and mentally retarded children] and to promulgate rules and regulations relating thereto with a view to providing equal opportunity for education to the school children of the State." (Emphasis added.) The act directed the department to adopt such "policy, procedure and program as it deems necessary to provide suitable transportation. . . ."[1]

The Board of Education, which formulates policy for the department under Article IX, Section 3, of the Hawaii Constitution, adopted Rule 1 on August 3, 1967. Rule 1 established regulations for the granting of subsidized bus transportation to school children attending both public and nonpublic (sectarian or parochial, and private) schools. Under the regulations, the children paid the first ten cents of the cost of a bus ride, and were subsidized only for the remaining cost of the ride (usually fifteen cents).[2]

---

[1] "In formulating the policy, procedure and program," the department was to consider "the school district, the school attendance area in which a school child normally resides, the distance the school child lives from the school, the availability of public carriers or other means of transportation, the frequency, regularity and availability of public transportation, and the grade level, physical handicap or special learning disability of a school child. . . ." The department could also consider "such conditions and circumstances unique or peculiar to a county or area." Act 233, § 2.

[2] The regulations also stated that:

(1) public school children attending kindergarten through the ninth grade were eligible for the subsidy only if they resided 2.5 miles or more

Acting under the authority purportedly granted to it by Acts 97 and 233 and Rule 1, the department also devised the following mechanics of operation in providing the subsidy to nonpublic school children: The department sent tickets representing the amount of the subsidy for each bus ride to the nonpublic schools. The schools were delegated the responsibility of passing out to the children forms of certification to be signed by the children's parents, attesting that the children qualified for the subsidy under the Rule 1 restrictions. Such forms were then collected by the schools and returned to the department, which made only a cursory, at-random check to determine whether the children were actually qualified. The schools were also delegated the responsibility of distributing tickets to the "certified" children and of sending lists containing the names of the "certified" children to the carriers. The children presented the tickets to the carriers, which were public agencies owning busses, or private persons, often the nonpublic schools themselves, owning and operating motor vehicles called "busses," "for compensation for the transportation of children to and from school." Act 233, S.L.H. 1967, § 3. The various carriers billed the department monthly for the total amount of the subsidy represented by all of the tickets collected in a month. The department, through the State Comptroller, then reim-

---

away from the public school they were attending, and public school children attending grades ten through twelve were eligible only if they resided 3 miles or more away from the high school they were attending;

(2) nonpublic school children were eligible for the subsidy if they attended a nonpublic school which was located in the area served by the public school which they would have attended had they not attended the nonpublic school (an area known as "the public school attendance area"); and

(3) nonpublic school children were also subject to the same 2.5-mile and 3-mile limits that were imposed on public school children receiving the subsidy.

There were minor variations in the regulations as applied to the various counties, but we find those variations to be of no legal consequence in deciding this case.

bursed the carriers. These mechanics were used during the 1966-67 school year and were to be followed during the 1967-68 school year, during which the department antici- pated an expense of $42,000 in providing the subsidy. Before the sum could be disbursed, however, appellants brought this action.

## II.

The nub of appellants' argument is that, by authoriz- ing subsidies to nonpublic school children for their bus rides, Acts 97 and 233 and Rule 1 appropriated funds for the "support or benefit" of nonpublic educational institu- tions. Defendants-appellees, including the Board of Educa- tion, the Superintendent of the Department of Education, and the State Comptroller, argue, inter alia, that the acts and the rule do not violate Article IX, Section 1, because the bus subsidy constitutes "support or benefit" to school children attending nonpublic educational institutions, not to the institutions themselves. In most jurisdictions which have faced the problem of classifying various forms of public assistance to nonpublic schools, this argument is known as the child benefit theory.[3] Appellees also argue

---

[3] The following jurisdictions have rejected the child benefit theory at one time or another and under specific circumstances: Oklahoma, in *Board of Education* v. *Antone*, 384 P.2d 911 (Okla. 1963) ; Wisconsin, in *Reynolds* v. *Nusbaum*, 17 Wis. 2d 148, 115 N.W.2d 761 (1962) ; Alaska, in *Matthews* v. *Quinton*, 362 P.2d 932 (Alaska 1961) ; Missouri, in *McVey* v. *Hawkins*, 364 Mo. 44, 258 S.W. 2d 927 (1953) ; New Mexico, in *Zellers* v. *Huff*, 55 N.M. 501, 236 P.2d 949 (1951) ; Washington, in *Visser* v. *Nooksack Valley School Dist.*, 33 Wash. 2d 699, 207 P.2d 198 (1949) ; Iowa, in *Silver Lake School Dist.* v. *Parker*, 238 Iowa 984, 29 N.W.2d 214 (1947) ; Kentucky, in *Sherrard* v. *Jefferson County Board of Education*, 294 Ky. 469, 171 S.W.2d 963 (1942) ; New York, in *Judd* v. *Board of Education*, 278 N.Y. 200, 15 N.E.2d 576 (1938), *reargument denied*, 278 N.Y. 712, 17 N.E.2d 134 (1938) ; Delaware, in *State ex rel. Traub* v. *Brown*, 36 Del. 181, 172 A. 835 (1934), *writ of error dismissed*, 39 Del. 187, 197 A. 478 (1938) ; Wisconsin, in *State ex rel. Van Straten* v. *Milquet*, 180 Wis. 109, 192 N.W. 392 (1923).

The following jurisdictions have adopted the child benefit theory, at one time or another and under specific circumstances: Pennsylvania, in *Rhoades* v. *School District of Abington Township*, 424 Pa. 202, 226

that there is a presumption in favor of the validity of the legislation. The lower court found no evidence to rebut that presumption and held for the appellees under the child benefit theory, among other grounds, in a judgment entered March 13, 1968. Appellants filed notice of appeal on March 27, 1968.[4]

The general rule is that, if the words used in a constitutional provision, such as Article IX, section 1, are clear and unambiguous, they are to be construed as they are written, *Judd* v. *Board of Education*, 278 N.Y. 200, 15 N.E.2d 576 (1938), *reargument denied*, 278 N.Y. 712, 17 N.E.2d 134 (1938). If an act of the Legislature is challenged as repugnant to such a constitutional provision, the burden of showing that it is unconstitutional is on the party asserting unconstitutionality, and that party must show that the repugnancy is too clear to admit of any dispute. *Henderson Bridge Co.* v. *Henderson City*, 173 U.S. 592, 615 (1899).

We find that appellants have met this requirement. As appellants contend, the intent of the framers of our Constitution regarding the nature of appropriations constituting "support or benefit" to sectarian and private schools is clear from the proceedings of our Constitutional Convention of 1950; the Convention delineated the scope of the State's role in the education of children in public and nonpublic schools, and it specifically rejected the child

---

A.2d 53 (1967); Connecticut, in *Snyder* v. *Town of Newton*, 147 Conn. 374, 161 A.2d 770 (1961); Maine, in *Squires* v. *City of Augusta*, 153 A.2d 80 (Me. 1959); California, in *Bowker* v. *Baker*, 73 Cal. App. 2d 653, 167 P.2d 256 (1946); Maryland, in *Adams* v. *County Commissioners of St. Mary's County*, 180 Md. 550, 26 A.2d 377 (1942), and *Board of Education of Baltimore County* v. *Wheat*, 174 Md. 314, 199 A. 628 (1938); Mississippi, in *Chance* v. *Mississippi Textbook Rating & Purchasing Board*, 190 Miss. 453, 200 So. 706 (1941); and Louisiana, in *Borden* v. *Board of Education*, 168 La. 1005, 123 So. 655 (1928).

4 Appellees moved to strike certain stipulations requested by appellants. The issues raised by the motion to strike do not reach the merits of the case, and we find it unnecessary to deal with those issues since we decide this case solely on the merits.

benefit theory as applied to bus transportation and similar general welfare programs for nonpublic school students.

The report in which the Committee on Education presented Article IX, which it wrote, to the Committee of the Whole for debate and passage is permeated with a strong recognition of the importance and unique function of public education in a democratic state, as compared with nonpublic education. *See* Standing Committee Report No. 52, *The Proceedings of the Constitutional Convention of Hawaii,* Vol. I, 201-206 (1950). The Committee on Education observed that it was acting in accordance with the will of the electorate of Hawaii in placing major emphasis on public education through a separate article on that subject in the Constitution rather than tacking or telescoping it onto the article on general welfare. This emphasis on public education can be largely attributed to the fact that, at that time, nonpublic schools in this jurisdiction were considered better able to provide education than public schools, although the latter had shouldered the burden of educating the bulk of the populace and of assimilating vast numbers of offspring of immigrants into the mainstream of American life, despite somewhat shabby treatment by the Legislature.[5]

---

[5] For a discussion of this point, *see generally* L. Fuchs, *Hawaii Pono: A Social History* (New York: 1961), at 263-298. Fuchs notes that prior to World War II, Hawaii continually adopted "meager" public school budgets. "A major reason for the relative neglect of the public schools was Hawaii's huge private-school establishment. The private-school tradition in Hawaii was stronger than anywhere else in the United States .... Forty years after annexation [in 1898], almost two out of every ten youngsters attending school in the Islands went to private institutions [in this context, a term referring to both sectarian and other private schools]." *Id.* at 296.

The gap in the quality of education provided by public schools and the quality of education provided by private schools is still reflected today in the ratings given to the various high schools in the State by the Accrediting Commission for Secondary Schools of the Western Association of High Schools and Colleges. About 44 per cent of the nonpublic high schools received the highest rating possible while none of the public high schools received such rating. *See* Appellants' Opening Brief, Appendix "M".

8

In the same report, the Committee also spelled out the stance that the State was to assume with respect to the sectarian and private schools. The Committee noted that a proposal that would remove "all privately supported and controlled educational institutions, *i.e.,* all nonpublic educational institutions, from government supervision," was rejected because it would "deny to the State such control as the licensing of private schools and such nominal supervisory control as might be necessary in the interests of the public health." *Id.* at 204. In short, the State was to retain such regulatory powers over the nonpublic schools as were required to guarantee that they met the minimum standards demanded of public schools, including standards of public health at the school plants.

At the same time, the Committee stated:

Your Committee has incorporated a prohibition against the appropriation of public funds "for the support or benefit of any sectarian, denominational or private educational institution." This provision is taken directly from the Organic Act and is usual in State Constitutions. It was not the intention of the Committee that this provision prohibit the present practice of the use of public money for dental and public health services in private schools within the Territory. *Id.* at 204.

Appellees argue that the dental and public health services mentioned in the report were considered a benefit to the children by the framers of our Constitution and that the Constitution gives the Legislature the power to authorize appropriations for similar programs benefiting children. In effect, appellees are arguing that the framers swung the door wide open to the child benefit theory, granting the Legislature the power to adopt any program as long as it benefited the welfare of children.

We find that the framers did not open the door one bit.

The language of the Constitution itself is unequivocal. It explicitly states: "Nor shall public funds be appropriated for the support or benefit of any sectarian or private educational institution." While the framers specifically excepted the existing practice of the use of public money for dental and public health services in private schools from the prohibition, the funds appropriated for such services were viewed not as a benefit to children but as funds to be used by the State to exercise "nominal supervisory control" over nonpublic schools "in the interests of the public health." The services were aimed at assuring that the nonpublic schools, as centers of learning, were as safe to attend as the public schools. Appellees admit that, even today, the children are inspected at the school itself during school hours.

Neither did the framers consider subsidies for bus transportation as grants made to enable the State to maintain "nominal supervisory control . . . in the interests of the public health." The debate in the Committee of the Whole shows that an appropriation for free bus transportation for nonpublic school children was exactly the kind of appropriation that the framers desired to prohibit under Article IX, Section 1. Delegate Kauhane, in arguing for funds for children attending nonpublic schools, stated,

> I feel that the State should provide for the education of its children of the citizens of this state. In providing such education, I feel that the State should provide for free basic textbooks. *The State should also provide, if transportation is provided for children attending public schools, that such transportation shall be provided for children attending sectarian or private schools* . . . . Certainly . . . all accommodations should be made for parents who are taxpayers and citizens of the state whose children attend private schools. They should be compensated or some just return for their

tax money that they pay to the public school educational system. (Emphasis added.) *The Proceedings of the Constitutional Convention of Hawaii,* Vol. II, 583-84 (1950).

Delegate Akau immediately responded:

I'd like to speak in favor of *"nor shall the public funds be appropriated for the support or benefit of any sectarian, denominational"* school. Not primarily because I believe in separation of church and state but for the very simple reason that those people who send their children to either parochial schools or private schools send their children there because they wish to send their children there. (Emphasis added.) *Id.* at 584.

Rejecting Delegate Kauhane's head-on attack, the Committee of the Whole retained the prohibition against appropriations to nonpublic schools. This result was not particularly surprising among a body that was vitally concerned with the need for better public education in Hawaii, as noted earlier.

Despite the clear-cut intent of the framers, appellees argue that the language used in Article IX, Section 1, of our Constitution is similar to that used in Louisiana, where such language has been interpreted to allow the child benefit theory. The theory first saw the light in *Borden v. Board of Education,* 168 La. 1005, 123 So. 655 (1928). The principal issue was whether an appropriation of public funds to purchase textbooks for school children, regardless of the school that they attended, could be made by the Legislature despite a provision in the State's Constitution declaring that "No public funds shall ever be used for the support of any private or sectarian school." The decision was 4-3, and the opinion reveals nothing to indicate that Louisiana's experience with regard to public and private education, at the time of the adoption of its

constitution, was similar to ours.[6] The framers of our Constitution debated the issue raised in *Borden* and declined to grant our Legislature the power to authorize funds for programs of public welfare benefiting nonpublic school children, such as the provision of textbooks or bus transportation. Hence, we find the Louisiana decision to be of no relevance in interpreting our own Constitution.

We find highly relevant the experience of our sister state, Alaska, in deciding whether a ban against "support or benefit" of nonpublic schools, under both the Organic Act and the Alaska State Constitution, proscribed free bus transportation to all school children living along already established goverment bus routes. The Alaska Organic Act stated: "Nor shall any public money be appropriated by the Territory or any municipal corporation therein for the support or benefit of any sectarian, denominational, or private school, or any school not under the exclusive control of the Government . . . ." 48 U.S.C.A. § 77. The provision in the Hawaii Organic Act is identical except that it deletes the phrase "by the Territory or any municipal corporation therein," an omission of no legal consequence in this context. 48 U.S.C.A. § 562. The Alaska Constitution, which took effect in 1958, provided that "No money shall be paid from public funds for the direct benefit of any religious or other private educational institution." The Hawaii Constitution, which took effect in 1959 and adopted the wording of the Hawaii Organic Act, is even more stringent in that it makes no distinction between "direct" and "indirect" benefits and continues the Organic Act proscription against "the support or benefit" of nonpublic educational institutions.

---

[6] For a full discussion of the background to *Borden* v. *Board of Education* and of the adoption of its reasoning in part by the United States Supreme Court, *see* G. La Noue, "The Child Benefit Theory Revisited: Textbooks, Transportation and Medical Care," 13 Journal of Public Law, 76, 80-81 (1964).

In *Matthews* v. *Quinton,* 362 P.2d 932 (Alaska 1961), *appeal dismissed,* 368 U.S. 517 (1962), the Supreme Court of Alaska inspected the leading cases on bus transportation schemes in other jurisdictions and concluded that the Alaska scheme described above was "support or benefit" to nonpublic schools under the Organic Act and a "direct benefit" to such schools under the Alaska Constitution. The Alaska court agreed with the reasoning of the New York Court of Appeals in *Judd* v. *Board of Education, supra,* in which it was concluded that bus transportation to nonpublic school students constituted support to nonpublic schools because such transportation induces attendance at those schools and promotes "the interests of the private school or religious sectarian institution that controls or directs it."[7] Such a transportation program "helps build up, strengthen and make successful the schools as organizations . . . . Without pupils there could be no school." *Id.* at 935.

This was precisely the kind of reasoning which motivated the framers of our Constitution in approving the prohibition against "support or benefit" of nonpublic educational institutions, as is made clear by the report of the Committee on Education and the Kauhane-Akau debate.

The mechanics of the bus subsidy program at issue indicate that the fears of the framers were well-founded. The subsidy does "build up, strengthen and make successful" the nonpublic schools. For one thing, the State has abdicated the responsibility of administering the subsidy

---

[7] The New York Constitution, at that time, contained a provision stating that "Neither the State nor any subdivision thereof, shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination and inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught." *See Judd* v. *Board of Education,* 278 N.Y. 207-208, 15 N.E.2d 580. After the decision in *Judd,* New York voters amended their constitution to provide for transportation of nonpublic school children at public expense.

program as applied to nonpublic school students and has allowed the nonpublic schools to determine which students will receive the subsidy and which ones will be transported by the carriers, through the submission of a list to the carriers. As the Department of Education official in charge of the program admitted at trial, the department maintains virtually no control over the distribution of the subsidy tickets to the students. Also, as in the *Judd* case, the subsidy induces attendance at nonpublic schools, where the school children are exposed to a curriculum that, in many cases, if not generally, promotes the special interests and biases of the nonpublic group that controls the school. Finally, to the extent that the State pays out funds to carriers owned by the nonpublic schools or agents thereof, the State is giving tangible "support or benefit" to such schools.

## III.

Appellees also argue that this court is bound by the majority decision in *Everson* v. *Board of Education of Ewing Township,* 330 U.S. 1 (1947), which, according to appellees, held that bus transportation to nonpublic school students is a "support or benefit" to school children, not to the institutions that the children attend. We do not find it necessary to comment on the accuracy of appellees' interpretation of *Everson,* since we do not find *Everson* applicable here. *Everson* involved a statute passed by the New Jersey Legislature providing for the transportation of school children "living remote from any schoolhouse" "to and from school other than a public school, except such school as is operated for profit in whole or in part." As pointed out in *Matthews* v. *Quinton, supra,* at 937, the United States Supreme Court "did nothing more than accept the state court's interpretation of the New Jersey constitution." The New Jersey Court of Errors and Ap-

peals had reached the conclusion that the New Jersey Legislature had the power under the New Jersey Constitution to declare that "a public purpose [would] be served by using tax-raised funds to pay the bus fares of all school children, including those who attend parochial schools." *Everson* v. *Board of Education of Ewing Township, supra* at 6. In other words, there was nothing in the New Jersey Constitution to proscribe such activity.[8]

The United States Supreme Court stated explicitly, ". . . [W]e do not mean to intimate that a state could not provide transportation only to children attending public schools." *Id.* at 16. Once the State undertakes to provide transportation under a "general state law" benefit program, however, it is required by the free exercise of religion clause of the First Amendment (as applied to the States through the Fourteenth Amendment) to extend the benefits of such a general program to children attending both parochial and public institutions. *Id.* at 16-17. Among such general programs would be programs

> where the state requires a local transit company to provide reduced fares to school children including those attending parochial schools, or where a municipally owned transportation system undertakes to carry all school children free of charge. *Id.* at 17.

The Court reserved judgment on the exclusion from the New Jersey program of students attending schools oper-

---

[8] The New Jersey Constitution did not contain a prohibition against appropriations to private and sectarian schools, as do the Alaska and Hawaii Constitutions. The relevant portion of the New Jersey Constitution read at that time, "Nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right, or has deliberately and voluntarily engaged to perform." *See Everson* v. *Board of Education of Ewing Township*, 133 N.J.L. 350, 366, 44 A.2d 333, 342 (1945). The Constitution was amended a few months after the *Everson* decision to provide explicitly for bus transportation for parochial school children. *See* New Jersey Constitution (1947), Article VIII, Section IV, paragraph 3.

ated in part or wholly for profit. *Id.* at 4.

The case before us involves a State that has decided to provide transportation only to children attending public schools—a situation not covered by *Everson.* As pointed out by the discussion in Part II of the historical bases of our Constitution, this State has tied its own hands regarding appropriations for the "support or benefit" of nonpublic schools. Regardless of the presumption in favor of the validity of the Legislature's actions, where the Legislature has not been granted the power by the people, under the State Constitution, to pass certain legislation, it cannot validly pass such legislation. Rather, the Legislature must return to the people to ask them to decide whether their State Constitution should be amended to grant the Legislature the power that it seeks, in this case, the power to provide "support or benefit" to nonpublic schools. Procedures are provided in Article XV, Section 1-3, of our Constitution for such amendment. Indeed, as noted earlier, constitutional amendment is the course followed by New York State after the *Judd* decision. *See* New York Constitution, Article XI, Section 4. In New Jersey, too, despite the fact that the *Everson* decision held that free bus transportation for parochial school children under conditions specified by the Legislature was allowed, the State Constitution was amended to allow explicitly for transportation for all school children. *See* New Jersey Constitution, Article VIII, Section IV, paragraph 3.

Having decided that the Hawaii Constitution ties the hands of the Legislature and prohibits it from making any appropriation aiding a sectarian or private school, including subsidies for bus transportation, we are compelled to conclude that Acts 97 and 233 and Rule 1 violate Article IX, Section 1, to the extent that they authorize appropriations to sectarian and private schools. At the same time, appropriations made for transportation of pub-

lic school children under authority granted by Acts 97 and 233 are valid.

Since only the transportation of public school children at public expense is constitutional, Act 97 transferred only that function to the State from the counties. It did not extend the responsibility of the State to include transportation of nonpublic school children. Furthermore, even if the transportation of nonpublic school students had been constitutional, the counties of Hawaii, Maui, and Kauai would not have transferred the function of transporting such children to the State because those counties did not have that function to begin with. By statute, the Legislature had granted those counties the power to transport only public school children.[9]

Similarly, even if the transportation of nonpublic school children had not violated Article IX, Section 1, the Department of Education still did not have the power under Act 233 to provide such transportation. The Legislature provided for the transportation of "all school children" in the act. Inspection of the wording of the act shows that the term "all school children" referred to all

[9] Appellees cite §§ 146-5, 147-6, and 148-3, R.L.H. 1955, as amended, as authority that vested on those counties the responsibilities for providing bus transportation to nonpublic school children as well as public school children. We can find no such authority in examining those provisions. Section 146-5 deals only with the transportation of public school children in the County of Hawaii. Section 147-6 makes similar provision for public school children attending certain schools in the County of Kauai. Section 148-3 deals with the "regulation of motor vehicle common carriers" in the County of Maui, not with school bus transportation.

Had the transportation of nonpublic school children been constitutional, in the case of the City and County of Honolulu, the City and County would have transferred that function to the State under Act 97, if the City and County had passed valid legislation providing for the transportation of such children prior to July 1, 1965, the effective date of Act 97. The City and County, which was granted more home rule powers than the other counties under the City Charter of 1960, had the power under § 2-101 of the Charter to "promote the general welfare and safety, health, peace, good order, comfort and morals of its inhabitants." Legislation to provide for transportation to school children would have had to conform to this requirement.

public school children, but not to nonpublic school children. In construing an act, the title may be resorted to for the purpose of ascertaining the meaning of the act. *In re Contested Election,* 15 Haw. 323, 331 (1903). The title of Act 233 was worded, "A Bill for an Act Relating to Education and Amending Chapter 37, R.L.H. 1955." Chapter 37 itself, entitled "Department of Education," deals exclusively with public education. Separate chapters cover matters affecting both public and nonpublic schools, such as minimum standards for teacher compensation (Chapter 38) and compulsory attendance age (Chapter 40). Also, the legislative history of Act 233 clearly indicates that it was intended to cover only public school children. The measure was viewed as follow-up legislation to Act 97. The transfer, from the counties to the State, of the program of transporting public school children, had been functioning on an ad hoc basis since Act 97 had gone into effect, and the Legislature felt that the time had come "to establish statewide policies and procedures relative to this program." *See* Standing Committee Report No. 460, re H.B. 294, Fourth State Legislature, April 4, 1967.

We realize fully that Article IX, Section 1, may overlap to some extent with Article VI, Section 6, which states that

> No tax shall be levied or appropriation of public money or property made, nor shall the public credit be used, directly or indirectly, except for a public purpose. No grant shall be made in violation of Section 3 of Article I of this Constitution.

Section 3 of Article I states that "No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof." Having decided that this State has totally denied itself the power to make appropriations aiding private and sectarian schools under Article IX, Sec-

18

tion 1, we do not find it necessary, at this time, to deter-mine whether the transportation of all school children under a general welfare program, as allowed by *Everson,* would violate Article VI, Section 6, or Article I, Section 3.[10]

Judgment reversed.

*Donald A. Beck* (*Smith, Wild, Beebe & Cades* of counsel) for plaintiffs-appellants.

*Roy Y. Takeyama,* Special Deputy Attorney General (*Bert T. Kobayashi,* Attorney General, and *George Pai,* Deputy Attorney General, with him on the brief) for defendants-appellees.

---

[10] We note, however, that in a case where it was asserted that a state legislature allowed for the payment of transportation to parochial school students but the state constitution prohibited any law supporting "any religious establishment," at least one state court has declared that we must, in the light of the clear provisions of our state constitution ... respectfully disagree with those portions of the Everson majority opinion which might be construed, in the abstract, as stating that transportation, furnished at public expense, to children attending religious schools, is not in support of such schools. While the degree of support necessary to constitute an establishment of religion under the First Amendment to the Federal constitution is foreclosed from consideration by reason of the decision in the Everson case ... we are constrained to hold that the [state] constitution although based on the same precepts, is clear denial [*i.e.,* clearly denies] the rights herein asserted by appellants [*i.e.,* those seeking the use of public funds to aid parochial educational institutions]. *Visser* v. *Nooksack Valley School District,* 33 Wash. 2d 699, 711, 207 P.2d 198, 204-5 (1949).