# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:_____**

**NO. S-1-SC-34974**

**CATHY MOSES and PAUL F. WEINBAUM,**

     Plaintiffs-Petitioners,

v.

**HANNA SKANDERA, Designate Secretary of Education, New Mexico Public Education Department,**

     Defendant-Respondent,

and

**ALBUQUERQUE ACADEMY, et al.,**

     Defendants/Intervenors-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Sarah M. Singleton, District Judge**

Graeser & McQueen, LLC
Christopher L. Graeser
Santa Fe, NM
Frank Susman
Santa Fe, NM

for Petitioners

New Mexico Public Education Department
Albert V. Gonzales, Deputy General Counsel
Santa Fe, NM

Sutin, Thayer & Browne, P.C.
Susan M. Hapka
Albuquerque, NM

for Respondent

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
R.E. Thompson
Emil J. Kiehne
Jennifer G. Anderson
Sarah M. Stevenson
Albuquerque, NM

Becket Fund for Religious Liberty
Eric S. Baxter
Washington, DC

for Intervenors-Respondents

**OPINION**

**CHÁVEZ, Justice.**

{1}    Intervenors' motion for rehearing is denied.  However, our prior opinion filed on November 12, 2015 is withdrawn and the following is substituted in its place.

{2}    Since the adoption of the New Mexico Constitution on January 21, 1911, New Mexico has had a constitutional responsibility to provide a free public education for all children of school age.  N.M. Const. art. XII, § 1.  However, "*no part* of the proceeds arising from the sale or disposal of any lands granted to the state by congress, or any other funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational *or private school*, college or university."  N.M. Const. art. XII, § 3 (emphasis added).  The New Mexico Department of Public Education's (Department) Instructional Material Bureau purchases non-religious instructional materials selected by public or private schools, with funds appropriated by the Legislature and earmarked for the schools, and lends these materials to qualified students who attend public or private schools.  NMSA 1978, § 22-15-7 (2010); *see also* NMSA 1978, § 22-8-34 (2001).  The question we address in this case is whether the provision of books to students who attend private schools violates Article XII, Section 3.  We conclude that the New Mexico Constitutional Convention was not willing to navigate the unclear line

between secular and sectarian education, or the unclear line between direct and indirect support to other than public schools. Indeed, in 1969 the voters rejected a proposed constitutional amendment that would have required New Mexico to provide free textbooks to all New Mexico school children. *See Proposed New Mexico Constitution* (*as adopted by the Constitutional Convention of 1969*) 45 (October 20, 1969). We hold that the plain meaning and history of Article XII, Section 3 forbids the provision of books for use by students attending private schools, whether such schools are secular or sectarian.

## I.     The Instructional Material Law is funded by appropriations

{3}     The Instructional Material Law (IML), NMSA 1978, §§ 22-15-1 to -14 (1967, as amended through 2011), grants the Department's Instructional Material Bureau statutory authority to lend approved instructional materials[1] to "[a]ny qualified student . . . attending a public school, a state institution *or a private school* approved by the department in any grade from first through the twelfth grade of instruction . . . ." Section 22-15-7(A) (emphasis added). "Instructional material shall be

---

[1] " '[I]nstructional material' means school textbooks and other educational media that are used as the basis for instruction, including combinations of textbooks, learning kits, supplementary material and electronic media." Section 22-15-2(C); *see also* § 22-15-3(A) ("The 'instructional material bureau' is created within the department of education [public education department]." (alteration in original)).

2

distributed to school districts, state institutions and private schools *as agents* for the benefit of students entitled to the free use of the instructional material." Section 22-15-7(B) (emphasis added). In turn, "[a]ny school district, state institution or private school *as agent* receiving instructional material pursuant to the Instructional Material Law is responsible for distribution of the instructional material for use by eligible students and *for the safekeeping* of the instructional material." Section 22-15-7(C) (emphasis added). Students or their parents are "responsible for the loss, damage or destruction of instructional material while the instructional material is in the possession of the student." Section 22-15-10(B).

{4}     The Department is required to publish a "multiple list" of state-approved instructional materials. Section 22-15-8(A), (B); § 22-15-2(D) (" '[M]ultiple list' means a written list of those instructional materials approved by the department."). Using the multiple list of state-approved instructional materials, "each school district, state institution or private school as agent may select instructional material for the use of its students . . . ." Section 22-15-8(B). "At least ten percent of instructional material on the multiple list concerning language arts and social studies shall contain material that is relevant to the cultures, languages, history and experiences of multi-ethnic students." Section 22-15-8(A). Moreover, "[t]he Department shall ensure that

3

parents and other community members are involved in the adoption process at the state level." *Id.*

{5}     The IML is funded through a non-reverting "instructional material fund" established by the State Treasurer "consist[ing] of appropriations, gifts, grants, donations and any other money credited to the fund." Section 22-15-5(A). In 1931, the Legislature enacted the State School Building, Text Book and Rural Aid Fund to purchase instructional materials with unappropriated federal funds obtained through the Mineral Lands Leasing Act (MLLA), 30 U.S.C. §§ 181 to 287 (1920, as amended through 2012). N.M. Laws 1931, ch. 138, § 2 ("There is hereby appropriated for the purposes of this fund, annually, all of the balance, not otherwise appropriated, in the [MLLA] Fund . . . ."). Today the Department's Instructional Material Bureau continues to purchase instructional materials for New Mexico students using federal MLLA funds. *See* § 22-8-34(A) ("Except for an annual appropriation to the instructional material fund and to the bureau of geology and mineral resources of the New Mexico institute of mining and technology . . . all other money received by the state pursuant to the provisions of the federal [MLLA], shall be distributed to the public school fund." (citation omitted)).

{6}     Each public and private school is allocated a percentage of money available in

the IML fund based on the number of students enrolled in their school.  Section 22-15-9(A).  "Private schools may expend up to fifty percent *of their instructional material funds* for items that are not on the multiple list; provided that *no funds* shall be expended for religious, sectarian or nonsecular materials . . . ."  Section 22-15-9(C) (emphasis added).  Such instructional material purchases must be identified and purchased through the Department's in-state depository.  Section 22-15-9(C), (E); *see also* § 22-15-4(D).  "Any balance remaining in an instructional material account of a private school at the end of the fiscal year shall remain available for reimbursement by the department for instructional material purchases in subsequent years."  Section 22-15-9(F).  The Department's Instructional Material Bureau has the authority to "withdraw or withhold the privilege of participating in the free use of instructional material in case of any violation of or noncompliance with the provisions of the Instructional Material Law or any rules adopted pursuant to that law."  Section 22-15-4(C).

{7}     In summary, the Legislature appropriates instructional materials funds and private schools are allocated a percentage of the funds based on the number of students enrolled in their schools.  Private schools select instructional materials from a multiple list, but they may spend up to 50 percent of their instructional materials

funds on items that are not on the multiple list, as long as the material is not religious in content. Any money remaining in the private schools instructional material fund may be carried over to subsequent years. Once the materials are purchased, the materials are loaned to the students. Hereafter in this opinion we will refer to this process as a "schoolbook loan program" for ease of reference.

## II. Procedural history

{8} Plaintiffs-Petitioners Cathy Moses and Paul F. Weinbaum (Petitioners) are New Mexico residents and have been taxpayers for at least the past five years. Petitioners currently have one or more children enrolled in elementary and/or secondary public schools in New Mexico. As New Mexico residents and taxpayers, Petitioners assert that the IML violates their constitutional rights because it supposedly forces them to "support[] and aid[] the religious dictates of others with whom they disagree"; appropriates or donates public funds to private parties; and supports "sectarian, denominational or private school[s]."

{9} Petitioners filed a verified complaint for declaratory judgment in the district court against Defendant-Respondent Hanna Skandera (Respondent), Secretary of the Department, seeking a declaration that the State issuing instructional materials to students attending private schools is unconstitutional because doing so supports

6

sectarian, denominational, or private schools in violation of New Mexico Constitution Article XII, Section 3; forces them as taxpayers to support the religious dictates of others in violation of New Mexico Constitution Article II, Section 11; and appropriates or donates public funds to private parties in violation of New Mexico Constitution Article IX, Section 14. Petitioners also relied on *Zellers v. Huff*, 1951-NMSC-072, 55 N.M. 501, 236 P.2d 949 to support their allegation that the schoolbook loan program is unconstitutional.

{10} Petitioners filed a motion for summary judgment, and Respondent and Albuquerque Academy, et al. (Intervenors) each filed a memorandum in opposition. The district court ruled that *Zellers* did not control and the provisions of the IML challenged by Petitioners did not violate the New Mexico Constitution. The district court then entered its order denying Petitioners' motion for summary judgment and granted summary judgment to Respondent.

{11} Petitioners appealed to the Court of Appeals, which affirmed the district court's grant of summary judgment to Respondent. *Moses v. Skandera*, 2015-NMCA-036, ¶¶ 3, 54, 346 P.3d 396, *cert. granted*, 2015-NMCERT-001. We granted Petitioners' petition for writ of certiorari to consider the following issues: (1) whether this Court's decision in *Zellers* constituted dicta; (2) whether the IML violates Article XII,

Section 3 of the New Mexico Constitution; (3) whether the IML violates Article IV, Section 31 of the New Mexico Constitution; (4) whether the IML violates Article IX, Section 14 of the New Mexico Constitution; and (5) whether the IML violates Article II, Section 11 of the New Mexico Constitution.

{12}     We conclude that the schoolbook loan program violates Article XII, Section 3, and therefore we do not address the remaining issues.  We reverse both the Court of Appeals and the district court.

**III.     The IML violates Article XII, Section 3 of the New Mexico Constitution**

{13}     Article XII, Section 3 provides:

> The schools, colleges, universities and other educational institutions provided for by this constitution shall forever remain under the exclusive control of the state, and no part of the proceeds arising from the sale or disposal of any lands granted to the state by congress, or any other funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational *or private school*, college or university.

(Emphasis added.)

{14}     Whether the schoolbook loan program violates the New Mexico Constitution is a question of law that we review de novo. *Tri-State Generation & Transmission Ass'n v. D'Antonio*, 2012-NMSC-039, ¶ 11, 289 P.3d 1232.  "It is well settled that there is a presumption of the validity and regularity of legislative enactments."

8

*Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, ¶ 11, 306 P.3d 457 (internal quotation marks and citations omitted). Petitioners bear the burden of proof to overcome the presumption of the validity and regularity of the IML. *Id.* We will uphold the constitutionality of the IML unless we are satisfied beyond all reasonable doubt that the Legislature exceeded the bounds of the New Mexico Constitution in enacting the IML. *Id.*

{15} "[T]he rules of statutory construction apply equally to constitutional construction." *State v. Boyse*, 2013-NMSC-024, ¶ 8, 303 P.3d 830 (internal quotation marks and citation omitted). "[W]e examine the plain language of the statute as well as the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868 (internal quotation marks and citation omitted).

{16} The Court of Appeals interpreted Article XII, Section 3 to provide protection only against the establishment of religion, similar to the Establishment Clause of the First Amendment to the United States Constitution and the Establishment Clause of Article II, Section 11 of the New Mexico Constitution. *Moses*, 2015-NMCA-036, ¶ 22. Accordingly, the Court of Appeals relied primarily on First Amendment cases to

9

hold that the IML did not violate Article XII, Section 3. *Moses*, 2015-NMCA-036, ¶ 34 (citing *Elane Photography, LLC v. Willock*, 2012-NMCA-086, ¶ 33, 284 P.3d 428).

{17}    We might agree with the Court of Appeals if the language of Article XII, Section 3 only prohibited the use of any public funds for the support of sectarian or denominational schools. The plain language of Article XII, Section 3 is more restrictive, and it therefore stands as a constitutional protection separate from the Establishment Clause as illustrated by the difference in language in each provision.

{18}    The Establishment Clause provides, in relevant part, that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I. In contrast, Article XII, Section 3 provides:

> The schools, colleges, universities and other educational institutions provided for by this constitution shall forever remain under the exclusive control of the state, and no part of the proceeds arising from the sale or disposal of any lands granted to the state by congress, or any other funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational *or private school*, college or university.

(Emphasis added.) The plain language of Article XII, Section 3 expressly restricts the use of public funds to other than sectarian schools, and therefore our analysis cannot be restricted by cases that analyze the Establishment Clause.

10

{19}     The historical context in which Article XII, Section 3 was adopted helps explain why this constitutional provision was not a recodification of the Establishment Clause of the New Mexico Constitution. During the early nineteenth century, public education was provided in public schools known as "common schools." *See* Mark Edward DeForrest, *An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns*, 26 Harv. J.L. & Pub. Pol'y 551, 558 (2003). "The common school was designed to function as an instrument for the acculturation of immigrant populations, rendering them good productive citizens in the image of the ruling majority." Joseph P. Viteritti, *Blaine's Wake: School Choice, The First Amendment, and State Constitutional Law*, 21 Harv. J.L. & Pub. Pol'y 657, 668 (1998). "Protestant ministers and lay people were in the forefront of the public-school crusade and took a proprietary interest in the institution they had helped to build. They assumed a congruence of purpose between the common school and the Protestant churches." *Id.* (internal quotation marks and citation omitted). "In many cases, it was difficult to distinguish between public and private institutions because they were often housed in the same building." *Id.* at 664. State statutes at the time authorized Bible readings in public schools and state judges generally refused to recognize the Bible as a sectarian book. G. Alan Tarr, *The New*

11

*Judicial Federalism in Perspective*, 72 Notre Dame L. Rev. 1097, 1103-04 nn.22-23 (citing Miss. Const. of 1890, art. 3, § 18); *Hackett v. Brooksville Graded Sch. Dist.*, 87 S.W. 792 (Ky. 1905); *Donahoe v. Richards*, 38 Me. 379 (1854)); Viteritti, *supra*, at 667-68.

{20}    By the middle of the nineteenth century, the Catholic immigrant population rose significantly. Viteritti, *supra*, at 669. The influx of Catholic immigrants created a demand for Catholic education, and consequently Catholics and other minority religionists challenged the Protestant influence in the common schools. *Id.* at 667-68; Steven K. Green, *The Blaine Amendment Reconsidered*, 36 Am. J. Legal Hist. 38, 44 (1992). By the 1870s, Catholic church leaders began to lobby their state legislatures for public funds to develop their own educational system. Viteritti, *supra*, at 668; Green, *supra*, at 44. This rise in Catholic influence created an obvious tension between the Protestant majority and the mostly Catholic minority on the issue of education, *see* Viteritti, *supra*, at 670-72, because the Protestant-run "common school was designed to function as an instrument for the acculturation of immigrant populations, rendering them good productive citizens in the image of the ruling majority." *Id.* at 668.

{21}    In response, "[o]pposition to aid to 'sectarian' schools acquired prominence in

12

the 1870's . . . ." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000). "[I]t was an open secret that 'sectarian' was code for 'Catholic.' " *Id.* Common school leaders successfully lobbied their state legislatures to adopt amendments prohibiting the use of state funds to support sectarian schools by the mid-to-late nineteenth century. *See, e.g.*, Colo. Const. art. IX, § 7; Del. Const. art. X, § 3; N.D. Const. art. VIII, §§ 1, 5; Ohio Const. art. VI, § 2. "In September of 1875, President Ulysses S. Grant responded to mounting political pressure when he publicly vowed to '[e]ncourage free schools, and resolve that not one dollar be appropriated to support any sectarian schools.' " Viteritti, *supra*, at 670 (alteration in original). President Grant called on Congress to draft a proposed constitutional amendment that would deny public support to religious institutions. *Id.*

{22}    Congressman James G. Blaine of Maine agreed to sponsor an amendment to the First Amendment that fulfilled President Grant's request. *See id.* at 670-71. Congressman Blaine's proposed constitutional amendment read:

> No State shall make any law respecting an establishment of religion, or prohibiting the free exercise thereof; and no money raised by taxation in any State for the support of public schools, or derived from any public fund therefor, nor any public lands devoted thereto, shall ever be under the control of any religious sect; nor shall any money so raised or lands so devoted be divided between religious sects and denominations.

Green, *supra*, at 38 n.2 (quoting 4 Cong. Rec. 5453 (1876) (quotation marks

13

omitted)). Congressman Blaine believed that his proposed constitutional amendment would correct a "constitutional defect" because at the time, the Establishment Clause had not been interpreted to apply to the states under the Fourteenth Amendment. Viteritti, *supra*, at 671 n.66 (citing *Permoli v. Municipality No. 1 of New Orleans*, 44 U.S. (3 How.) 589, 609 (1845) ("The Constitution makes no provision for protecting the citizens of the respective states in their religious liberties; this is left to the state constitutions and laws . . . .").

{23}     Despite the fact that Congressman Blaine's proposed amendment failed to pass in the United States Senate, several states amended their constitutions to include a ban on funding of sectarian education.  Viteritti, *supra*, at 672.  "By century's end [congressional] leaders had come to understand that federal aid could be used as a wedge for manipulating public policy. . . . Particularly vulnerable to the Republican agenda were those new territories seeking statehood." *Id.* at 672-73.  "As a matter of course, [new territories seeking statehood] would be required to incorporate Blaine-like provisions into their new constitutions in order to receive congressional approval." *Id.* at 673.

{24}     Congress granted New Mexico statehood on the explicit condition that it adopt a similar "Blaine" provision in the New Mexico Constitution.  *See* Enabling Act for

14

New Mexico of June 20, 1910, 36 Stat. 557, ch. 310, § 8 (Enabling Act).[2]  In the Enabling Act, "Congress set forth the terms by which New Mexico would be admitted as a state." *Forest Guardians v. Powell*, 2001-NMCA-028, ¶ 6, 130 N.M. 368, 24 P.3d 803.  In an election held on January 21, 1911 to vote on the New Mexico Constitution adopted by the Constitutional Convention of 1910, New Mexico voters ratified all of the terms of the Enabling Act in Article 21, Section 9 of the 1911 New Mexico Constitution. *See Constitutions of New Mexico 1910-34*.  Article 21, Section 10 of the 1911 New Mexico Constitution provides that "[t]his ordinance is irrevocable without the consent of the United States and the people of this State, and no change or abrogation of this ordinance, in whole or in part, shall be made by any constitutional amendment without the consent of Congress." *Id.*; Enabling Act § 2; *see also* N.M. Const. art. 21, §§ 1-11 (incorporating all Enabling Act measures into the New Mexico Constitution and making the Enabling Act irrevocable without the consent of Congress and the citizens of New Mexico).  Because the Enabling Act was

---

[2]Section 8 of the Enabling Act explicitly requires that

> [t]he schools, colleges and universities provided for in this act shall forever remain under the exclusive control of the said state, and no part of the proceeds arising from the sale or disposal of any lands granted herein for educational purposes shall be used for the support of any sectarian or denominational school, college or university.

adopted during New Mexico's 1910 Constitutional Convention, N.M. Const. art. 21, §§ 1-11, it functions as a "fundamental law to the same extent as if it had been directly incorporated into the Constitution." *State ex rel. King v. Lyons*, 2011-NMSC-004, ¶ 3, 149 N.M. 330, 248 P.3d 878 (internal quotation marks and citation omitted).

{25}     Sections 6 through 9 of the Enabling Act pertain to specified public lands that were granted to New Mexico to be held in trust "for the support of common schools." Enabling Act § 6.  To the extent that lands "are mineral, or have been sold, reserved or otherwise appropriated or reserved by or under the authority of any act of congress," they are to be treated as all other public lands specified under Sections 6 through 9 of the Enabling Act.  Enabling Act § 6.

> Congress contemplated that any change . . . to the use of the proceeds of the lands granted to the state should be effectuated by amendment to the Constitution, and . . . any change in the use and application of the proceeds of these land grants may . . . be done by way of a constitutional amendment.

*Lyons*, 2011-NMSC-004, ¶ 4 (first and third omissions in original) (internal quotation marks and citation omitted).

{26}     Grants of land were made to New Mexico specifically for, among other things, "university purposes, . . . schools and asylums for the deaf, dumb and the blind, . . .

16

normal schools, . . . agricultural and mechanical colleges, . . . school of mines, [and] military institutes." Enabling Act § 7. Lands granted to New Mexico and any proceeds derived from them are to be held in trust. Enabling Act § 10, ¶ 1. If the lands or money so derived are used for something other than the named purposes, it is a breach of the Enabling Act. Enabling Act § 10, ¶ 2. The Enabling Act "is binding and enforceable and the legislature is without power to divert the fund for another purpose than that expressed." *State ex rel. Interstate Stream Comm'n v. Reynolds*, 1963-NMSC-023, ¶ 22, 71 N.M. 389, 378 P.2d 622.

{27} Specifically relevant to our inquiry is Section 8 of the Enabling Act, which may be characterized as a Blaine provision because of the time of its adoption and because it precludes the use of public funds for the support of sectarian or denominational schools.

> [T]he schools, colleges, and universities provided for in this act shall forever remain under the exclusive control of the said state, and no part of the proceeds arising from the sale or disposal of any lands granted herein for educational purposes shall be used for the support of any sectarian or denominational school, college or university.

*Id.* This language is nearly identical to that of Article XII, Section 3, with two critical differences. The Enabling Act prohibits the use of "proceeds arising from the sale or disposal of any lands granted [in the Enabling Act] for educational purposes" to

17

support sectarian schools. Enabling Act § 8. In contrast, the drafters of the New Mexico Constitution restricted the use of proceeds from *any* lands granted to New Mexico by Congress, not only those granted in the Enabling Act, and they also restricted the use of any funds appropriated, levied, or collected for educational purposes for the support of not only sectarian schools, but also the much broader category of private schools. Through these changes, the Constitutional Convention decided to provide for additional restrictions on public funding of education beyond the restrictions required by Section 8 of the Enabling Act. *See Highlights of the August 15, 1969, Session of the 1969 Constitutional Convention Submitted August 14, 1969* at 4. The members of the Constitutional Convention chose to play it safe—by broadening the provision to reach all private schools, they avoided drawing a line between secular and sectarian education. In addition, they were not willing to limit the funds that would be restricted from use for private schools—they went well beyond "proceeds arising from the sale or disposal of any lands granted" under Section 8 of the Enabling Act and chose to restrict the use of "any other funds appropriated, levied or collected for educational purposes." N.M. Const. art. XII, § 3.

{28}     The MLLA appropriates funds to New Mexico "to be used by such State and

its subdivisions, as the legislature of the State may direct . . . , for (i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service." 30 U.S.C. § 191(a). MLLA funds are not specifically allocated for schools or school books. The Legislature, which has the constitutional responsibility to appropriate funds, *see* New Mexico Constitution Article IV, Section 30, has discretion to appropriate MLLA funds for any purpose consistent with the broad purposes described in the MLLA. Intervenors contend that the provision of school books for children attending both public and private schools constitutes a "public service." Although we agree with this broad philosophical statement, the provision of school books is an educational purpose. Article XII, Section 3 controls the Legislature's discretion when money is appropriated for educational purposes by prohibiting the appropriation of educational funds to private schools.

{29} Intervenors contend that the MLLA preempts any state constitutional restriction on the Legislature's discretion with respect to MLLA funds as long as the Legislature appropriates the funds consistent with the broad purposes of the MLLA. In support of their argument, Intervenors cite to *State ex rel. Sego v. Kirkpatrick*, 1974-NMSC-059, 86 N.M. 359, 524 P.2d 975 and *Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985). These cases are

19

inapposite. The *Sego* Court held that the Legislature does not have the power to control the manner and extent of the use or expenditure of funds received by institutions of higher learning from Congress or from private donations. 1974-NMSC-059, ¶¶ 48-51. In *Lawrence*, the United States Supreme Court held that a federal statute specifically providing local governments with discretion in distributing federal funds preempted a state statute attempting to control how local governments allocated such funds. 469 U.S. at 261-68. Stated simply, Congress appropriated the funds to local governments, not to the State; therefore, the State did not have authority to dictate how local governments spent the money directly allocated to them by Congress. Similarly, when Congress appropriates money to New Mexico institutions of higher learning, under this Court's holding in *Sego*, the Legislature lacks authority to direct the use of such funds. The MLLA does not specifically appropriate funds to or for school purposes. Simply because the MLLA gives discretion to our Legislature does not mean that the Legislature is at liberty to ignore state constitutional limitations on its discretion. The MLLA has neither expressly nor impliedly preempted the application of Article XII, Section 3 because restricting funds appropriated for educational purposes to public schools is not incompatible with the purposes announced in the MLLA. Thus, Intervenors' argument that funds

20

from the MLLA that are used for the Instructional Material Fund are federal funds which are "not subject to state constitutional limitations" is without merit.

{30} The Court of Appeals held that the direct recipients of the IML financial program are the parents of the children, and therefore the benefit to private schools is not direct enough to violate Article XII, Section 3. *Moses*, 2015-NMCA-036, ¶ 40. We can not agree that Article XII, Section 3 only prohibits direct support to private schools. The broad language of this provision and the history of its adoption and the efforts to amend it evince a clear intent to restrict both direct and indirect support to sectarian, denominational, or private schools, colleges, or universities. Our interpretation is supported by the failed attempt in 1969 of the delegates to the New Mexico Constitutional Convention to amend the precursor of Article XII, Section 3. *Report of the Constitutional Revision Commission* 158 (1967). Using the Alaska Constitution as a template, the Constitutional Revision Commission proposed revising the precursor of Article XII, Section 3 to read "[t]he public schools and institutions of the state shall be free from sectarian control. No money shall be paid from public funds for the *direct benefit* of any religious or other private educational institution." New Mexico Legislative Council Service, *Workbook of Selected Constitutions Prepared For Delegates to the New Mexico Constitutional Convention*

21

*1969* (July 15, 1969) (emphasis added). This proposed revision would not have been necessary if a reasonable interpretation of Article XII, Section 3 as written only precluded direct support of sectarian and private schools. However, the proposed revision was never submitted to the voters for ratification in December 1969. *See generally Proposed New Mexico Constitution* (*as adopted by the New Mexico Constitutional Convention of 1969*) (October 20, 1969).

{31}     Instead, the Constitutional Convention proposed a constitutional amendment that would address the crux of the question: may public funds be used to provide free textbooks to all students, including those who attend private schools? *See id.* at 45. The constitutional amendment submitted to the voters for adoption read: "The legislature shall provide for a system of free textbooks for use by school children of this state. The system shall be administered by the state board of education." *Id.* The Legislative Council Service warned the Constitutional Convention that "[t]his [provision] violates the Enabling Act and conflicts with other provisions of the proposed constitution." New Mexico Legislative Council Service, *A New Constitution for New Mexico?  An Analysis of Major Changes and Arguments For and Against* 43 (October 31, 1969). Specifically, the Legislative Council Service was concerned that "[t]his provision requires the state to indirectly aid and support

22

sectarian and denominational schools." *Id.* Notwithstanding the Legislative Council Service's concerns, the Constitutional Convention submitted this constitutional amendment to the voters for ratification, which the voters rejected. *See Proposed New Mexico Constitution* at 45; N.M. Const. art. XII, § 3.

{32}     The history of Congressman Blaine's attempt to amend the United States Constitution coupled with the New Mexico Enabling Act demonstrates why Article XII, Section 3 cannot be interpreted under jurisprudence analyzing the Establishment Clause. Article XII, Section 3 must be interpreted consistent with cases analyzing similar Blaine amendments under state constitutions. For example, in *California Teachers Ass'n v. Riles*, the California Supreme Court addressed a challenge to a California law authorizing the Superintendent of Public Instruction to lend to students attending non-profit, non-public schools textbooks used in the public schools without charge. *See generally* 632 P.2d 953 (Cal. 1981). Article IX, Section 8 of the California Constitution provided that "[n]o public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools . . . ." Similar to Article XII, Section 3 of the New Mexico Constitution, this constitutional provision incorporated a Blaine-like amendment for sectarian and denominational schools, but it also

23

extended the restriction to non-public schools. Additionally, Article XVI, Section 5 of the California Constitution provided:

> Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever . . . .

{33} In *California Teachers Ass'n*, the California Supreme Court was critical of the "child benefit theory" in light of its state constitutional provision because the "doctrine may be used to justify any type of aid to sectarian schools[;] . . . practically every proper expenditure for school purposes aids the child." 632 P.2d at 957, 960 (internal quotation marks and citation omitted). The California Supreme Court reasoned that "the application of the 'child benefit' theory in this circumstance 'ignores substance for form, reality for rhetoric, *and would lead to total circumvention of the principles of our Constitution.*' " *Id.* at 963 (emphasis added) (citation omitted). The California Supreme Court noted that the broad language of Article IX, Section 8 and Article XVI, Section 5 of the California Constitution "do not confine their prohibition against financing sectarian schools *in whole or in part* to support for their religious teaching function, as distinguished from secular

24

instruction." *California Teachers Ass'n*, 632 P.2d at 964 (emphasis added). As a result, a full majority of the California Supreme Court concluded that the textbook program could not survive state constitutional scrutiny, even if the benefit to the schools was only incidental. *See id.* at 961-62 n.12.

{34} In *Gaffney v. State Department of Education*, the Nebraska Supreme Court addressed the constitutionality of a textbook lending program under Article VII, Section 11 of the Nebraska Constitution:

> Neither the state Legislature nor any county, city or other public corporation, shall *ever* make *any appropriation* from any public fund, or grant any public land *in aid of any sectarian* or denominational *school or college,* or any educational institution which is not *exclusively owned and controlled* by the *state* or a *governmental subdivision* thereof.

220 N.W.2d 550, 553 (Neb. 1974) (quoting Neb. Const. art. VII, § 11 (emphasis in original) (internal quotation marks omitted)). The Nebraska Supreme Court relied on the broad language of Article VII, Section 11 of the Nebraska Constitution to hold that the textbook loan program unconstitutionally furnished aid to private sectarian schools. *Gaffney*, 220 N.W.2d at 557. The Nebraska Supreme Court concluded that the fact that the loan of textbooks was to the parents and students was not determinative because the program "lends strength and support to the school and, although indirectly, lends strength and support to the sponsoring sectarian

25

institution." *Id.*

{35} The Supreme Courts of Oregon, Massachusetts, and Missouri interpreted similar Blaine-like state constitutional provisions and determined that even indirect aid to the sectarian, denominational, or private schools violates the constitutional provision. *See Dickman v. Sch. Dist. No. 62C, Or. City, of Clackamas Cty.*, 366 P.2d 533, 543 (Or. 1961) (en banc) (holding that "the aid is extended to the pupil only as a member of the school" the pupil attends, and although the pupil may share in the indirect benefit, "such aid is an asset to" the sectarian or private school); *see also Bloom v. Sch. Comm. of Springfield*, 379 N.E.2d 578, 580 (Mass. 1978) (same); *Paster v. Tussey*, 512 S.W.2d 97, 104 (Mo. 1974) (en banc) (same).

{36} South Dakota and Hawaii have reached similar conclusions under their state constitutions. This is important because like New Mexico, these states were required to adopt Blaine-like amendments into their respective state constitutions for their admission into the Union. For example, in *In re Certification of a Question of Law from the United States District Court, District of South Dakota, Southern Division*, the South Dakota Supreme Court addressed a textbook lending program in which the defendants raised arguments similar to those raised by Respondent and Intervenors in this case. *See generally* 372 N.W.2d 113 (S.D. 1985). The South Dakota Supreme

Court noted that it was charged "with the responsibility of interpreting provisions of [its] state constitution that are more restrictive than the Establishment Clause of the United States Constitution." *Id.* at 116, 118 ("[T]hose provisions of our constitution . . . are not mere reiterations of the Establishment Clause of the United States Constitution but are more restrictive as prohibiting aid in every form." (internal quotation marks and citation omitted)).  In ultimately holding that the textbook loan program was unconstitutional, the South Dakota Supreme Court specifically rejected the defendants' analogy between the textbook lending program "and the lending of books by the public libraries in the state," because any benefit to sectarian or private schools violated its state constitutional provision. *Id.* at 117.

{37}     In addition, Hawaii, which was the last state admitted into the Union, has a constitutional provision similar to New Mexico's.  Article X, Section 1 of the Hawaii Constitution provides:  "[N]or shall public funds be appropriated for the support or benefit of any sectarian or nonsectarian private educational institution . . . ."  Like the New Mexico Constitution, the Hawaii Constitution is more restrictive than the federal Establishment Clause.  In *Spears v. Honda*, the Hawaii Supreme Court addressed the constitutionality of a statute requiring state-subsidized bus transportation for all school children, including sectarian and private school students.  449 P.2d 130, 132,

27

135, 135 n.5 (Haw. 1968). The Court attributed great significance to the history of what was then Article IX, Section 1 of the Hawaii Constitution, now codified as Hawaii Constitution Article X, Section 1. *Spears*, 449 P.2d at 134-36. The Court's review of the constitutional history of Article IX, Section 1 revealed that the prohibition on using public funds to benefit private schools in Hawaii was intended to narrow the gap between the quality of education provided by private schools and public schools. *Spears*, 449 P.2d at 132-33, 135 n.5.

{38}    The *Spears* Court concluded that it was important to understand that, unlike the Establishment Clause of the United States Constitution, what was then Article IX, Section 1 of the Hawaii Constitution was not exclusively about religion. 449 P.2d at 137-38. The Court found that

> [(1)] the bus subsidy buil[t] up, strengthen[ed] and ma[d]e successful the nonpublic schools[; (2)] the subsidy induce[d] attendance at nonpublic schools, where the school children are exposed to a curriculum that, in many cases, if not generally, promotes the special interests and biases of the nonpublic group that controls the school[; and (3)] to the extent that the State [paid] out funds to carriers owned by the nonpublic schools or agents thereof, the State [gave] tangible support or benefit to such schools.

*Id.* (internal quotation marks omitted). The *Spears* Court ultimately held that the bus subsidy violated Article IX, Section 1, because it constituted an appropriation of public funds to non-public schools. *Id.* at 139. It is worth noting that the *Spears*

28

Court suggested that the Legislature "return to the people to ask them to decide whether their State Constitution should be amended to grant the Legislature the power that it seeks, in this case, the power to provide 'support or benefit' to nonpublic schools." *Id.*

{39} Article XII, Section 3 of the New Mexico Constitution prohibits the use of any part of the proceeds from the sale or disposal of any land granted to the state by Congress or any other funds appropriated, levied, or collected for educational purposes for sectarian, denominational schools. The framers of our Constitution chose to further restrict the use of public funds by prohibiting their use for the support of private schools. As a result, a public school under the control of the State can directly receive funds, while a private school not under the exclusive control of the State can not receive either direct or indirect support.

{40} It is clear that private schools in New Mexico have control of what instructional materials will be purchased with their allocation of instructional material funds. The fact that students who attend private schools, just like students who attend public schools, are only loaned these instructional materials is not material to the analysis. Private schools benefit because they do not have to buy instructional materials with money they obtain by tuition or donations and they can divert such

money to other uses in their schools. Consistent with the rules of statutory construction and the majority of jurisdictions interpreting similar state constitutional provisions, the IML violates Article XII, Section 3 because it provides support to private schools.

**IV.    Conclusion**

{41}    We reverse the Court of Appeals and the district court and determine that the IML violates New Mexico Constitution Article XII, Section 3.

{42}    **IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice, Retired**
**Sitting by designation**

30

_____

**CHARLES W. DANIELS, Justice**