***FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

**Electronically Filed**
**Supreme Court**
**SCAP-16-0000475**
**13-AUG-2019**
**07:51 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

CHELSA-MARIE KEALOHALANI CLARABAL, individually and as next
friend of C.M.K.C. and C.M.M.C., minors,
Plaintiff-Appellant,

vs.

DEPARTMENT OF EDUCATION OF THE STATE OF HAWAI'I; BOARD OF
EDUCATION OF THE STATE OF HAWAI'I; CHRISTINA M. KISHIMOTO, in her
official capacity as Superintendent of the Department of
Education; CATHERINE PAYNE, in her official capacity as Chairman
of the Board of Education; BRIAN J. DELIMA; DAMIEN BARCARSE;
MAGGIE COX; NOLAN KAWANO; CHRISTINE NAMAU'U; DWIGHT TAKENO;
KENNETH UEMURA; AND BRUCE VOSS, in their official capacities as
members of the Board of Education; HAWAI'I TEACHER STANDARDS
BOARD, Defendants-Appellees.

SCAP-16-0000475

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-16-0000475; CIV. NO. 14-1-2214)

AUGUST 13, 2019

McKENNA, POLLACK, AND WILSON, JJ., WITH RECKTENWALD, C.J.,
CONCURRING IN THE JUDGMENT AND NAKAYAMA, J., CONCURRING AND
DISSENTING

OPINION OF THE COURT BY POLLACK, J.

"The language of a people is an inextricable part of

the identity of that people.  Therefore, a revitalization of a

suppressed language goes hand in hand with a revitalization of a suppressed cultural and political identity."  Shari Nakata, Language Suppression, Revitalization, and Native Hawaiian Identity, 2 Chap. Diversity & Soc. Just. F. 14, 15 (2017).

Historically, the Hawaiian language played a fundamental role in all aspects of Native Hawaiian society.  It was utilized not only for practical communication in daily life, but also to express and preserve creation and genealogical chants, prayers, histories, narratives, proverbs, nā mele,[1] and other knowledge that connected Native Hawaiians with each other and their ancestors through a shared cultural identity.  This common link was nearly severed as a result of Western colonialism, which sought to impose English as the exclusive medium of communication as part of a larger effort to forcefully assimilate the Hawaiian people.  Central to this process was the banning of the use of the Hawaiian language in schools--an extremely effective tactic that had driven the language to the brink of extinction by the latter half of the twentieth century.

It was at this critical time that a series of amendments aimed at revitalizing the Hawaiian language was made to the Hawai'i Constitution, including a provision obligating the

---

[1]  "Mele" is a Hawaiian word that may be translated as a "[s]ong, anthem, [] chant of any kind[,] poem, [or] poetry."  Mele, Hawaiian Dictionary: Revised and Enlarged Edition (Mary Kawena Pukui & Samuel H. Elbert eds., 1986).

State to provide for a Hawaiian education program in public schools consisting of language, culture, and history. Thereafter, a grassroots effort led the State to establish a number of Hawaiian immersion public schools in which Hawaiian is the standard language of instruction. The children who attend these schools become fluent in the Hawaiian language, and the program has resulted in great progress toward reversing the decline in the number of Hawaiian language speakers.

Today, there are Hawaiian immersion schools on five of the major Hawaiian Islands, but no such program exists on the island of Lāna'i. This case arises from a suit by a mother living on Lāna'i on behalf of herself and her two school-age daughters. The mother argues that the provision of the Hawai'i Constitution obligating the State to provide for a Hawaiian education program in public schools requires the State to provide her daughters with access to a public Hawaiian immersion education.

On review, we hold that the Hawaiian education provision was intended to require the State to institute a program that is reasonably calculated to revive the Hawaiian language. Because the uncontroverted evidence in the record demonstrates that providing reasonable access to Hawaiian immersion education is currently essential to reviving the Hawaiian language, it is a necessary component of any program

that is reasonably calculated to achieve that goal.  The State is therefore constitutionally required to make all reasonable efforts to provide access to Hawaiian immersion education.  We remand for a determination of whether it has done so.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A. The History of 'Ōlelo Hawai'i and Hawaiian Language Education

#### 1. Early Developments

'Ōlelo Hawai'i, the Hawaiian language, has long been used by the indigenous inhabitants of the Hawaiian Islands to communicate and pass down the customs and traditions that underlie their culture.  Paul F. Nahoa Lucas, E Ola Mau Kākou I Ka 'Ōlelo Makuahine: Hawaiian Language Policy and the Courts, 34 Haw. J. Hist. 1, 1 (2000).  A "poetic, expressive language" consisting of over 25,000 words, it is considered by linguists to "belong[] to the family of Austronesian (Malayo-Polynesian) languages."  Id.  The makeup of 'ōlelo Hawai'i is reflective of the history and cultural priorities of the people who speak it; for example, the language includes approximately 130 words for types of rain, 160 words for types of wind, and 133 words for house.[2]  Id. at 2; Mary Kawena Pukui & Samuel H. Elbert, New

---

[2]  Another example of this diversity of subtle meaning may be found in the recent naming of a black hole 54 million light-years from earth. After an image of the extrastellar body was in-part created through the use of two Hawai'i-based telescopes, astronomers named the black hole "Powehi," a word taken from a Native Hawaiian creation chant that means "the adorned fathomless dark creation" or "embellished dark source of unending creation."

(continued . . .)

Pocket Hawaiian Dictionary 225 (1992). 'Ōlelo Hawai'i also utilizes and incorporates figurative meaning "to an extent unknown in English."[3] Lucas, supra, at 2 (quoting Albert J. Schütz, The Voices of Eden: A History of Hawaiian Language Studies 209-10 (1994)). Further, the spoken word aided in the formation and perpetuation of a shared Hawaiian identity. In the words of Kiowa novelist, poet, and essayist N. Scott Momaday,

> Oral tradition is the other side of the miracle of language. As important as books are--as important as writing is, there is yet another, a fourth dimension of language which is just as important, and which, indeed, is older and more nearly universal than writing: the oral tradition, that is, the telling of stories, the recitation of epic poems, the singing of songs, the making of prayers, the chanting of magic and mystery, the exertion of the human voice upon the unknown—in short, the spoken word. In the history of the world nothing has been more powerful than that ancient and irresistible tradition vox humana.

N. Scott Momaday, Man Made of Words 81 (1997).

In 1795, the Kingdom of Hawai'i was established, and King Kamehameha I completed the unification of the islands under his rule in 1810. Native Hawaiian Law: A Treatise 10 (Melody Kapilialoha MacKenzie et al. eds., 2015). Thereafter, Western missionaries traveled to the kingdom intending to educate the

---

(. . . continued)

Timothy Hurley, Black Hole Named Powehi, Star Advertiser, Apr. 11, 2019, at B1.

[3] Many words and expressions in 'ōlelo Hawai'i have "kauna," which are hidden layers of meanings in addition to their literal definition. See The Pacific Islands: Environment & Society 168 (Moshe Rapaport ed., 1999).

local populace about Christianity.  Ka'ano'i Walk, Comment,
"Officially" What? The Legal Rights and Implications of 'Ōlelo
Hawai'i, 30 U. Haw. L. Rev. 243, 244 (2007).  The missionaries
set about standardizing a written form of oral 'ōlelo Hawai'i in
order to provide more effective instruction and facilitate the
dissemination of their lessons among the islands' inhabitants.
Lucas, supra, at 2.  In 1822, they published the Pī 'ā pā, the
first written primer on the Hawaiian language.  Id.

The Hawaiian people quickly mastered the written word.
Newspapers were published in 'ōlelo Hawai'i as early as 1834,[4] and
nearly three-quarters of the adult Hawaiian population were
literate in their native language by 1853.[5]  Id.

'Ōlelo Hawai'i came to coexist in many contexts with
English, which was often employed "[o]f necessity . . . to
record transactions of the government in its various branches,
because the very ideas and principles adopted by the government
[came] from countries where the English language [was] in use."

---

[4]    The two earliest Hawaiian language newspapers were Ka Lama Hawaii
and Ke Kumu Hawaii. Joan Hori, Hamilton Library, Univ. of Hawaii at Mānoa,
Background and Historical Significance of Ka Nupepa Kuokoa 1 (2001),
https://libweb.hawaii.edu/digicoll/nupepa_kuokoa/
kuokoa_htm/Kuokoa_Essay.pdf [https://perma.cc/4EPY-88DA].  The Hawaiian
newspaper Ka Nupepa Kuokoa had a sixty-six year publication history that
began in 1861 and continued to 1927.  Id. at 4.

[5]    Other sources report literacy rates as high as ninety-one to
ninety-five percent by 1834.  See Ka'ano'i Walk, King Liholiho Led the
Hawaiians' Amazing Rise to Literacy in the 1820s, Kamehameha Schools
Ka'iwakīlouimoku Hawaiian Cultural Center (Feb. 2014),
https://apps.ksbe.edu/kaiwakiloumoku/node/606 [https://perma.cc/K2G9-R9W3].

In re Ross, 8 Haw. 478, 480 (Haw. Kingdom 1892). The two languages were generally viewed as interchangeable for official business, and the "use of the Hawaiian language in any instance" was "perfectly regular and legal." Id. Indeed, beginning in 1846, the Hawaiian legislature declared that all laws enacted would be published in both English and ʻōlelo Hawaiʻi. Lucas, supra, at 3 (citing Act of Apr. 27, 1846, ch. 1, art. 1, sec. 5). Early decisions by this court "reaffirmed the supremacy of Hawaiʻi's indigenous language as the governing law of the Islands," by holding that it was the ʻōlelo Hawaiʻi version of a statute that was controlling in the event of a conflict between the two publications. Lucas, supra, at 3 (citing Metcalf v. Kahai, 1 Haw. 225, 226 (Haw. Kingdom 1856); Hardy v. Ruggles, 1 Haw. 255, 259 (Haw. Kingdom 1856)).[6]

It is thus unsurprising that when King Kamehameha III first established Hawaiʻi's centralized public education system in 1841, the curriculum was primarily delivered through the medium of the Hawaiian language. Haw. State Dep't of Educ.,

---

[6] Advocates of establishing English as Hawaiʻi's primary language successfully lobbied the Hawaiian legislature to overturn these decisions, and in 1859 a new law was enacted declaring that the English version of a statute "shall be held binding" in the event of a "radical and irreconcilable difference" between the two versions. Lucas, supra, at 4 (citing Haw. Civil Code of 1859, sec. 1493) (emphasis omitted).

History of Hawaiian Education.[7]  Foreign political and economic influence led to the founding of competing English-standard schools over the next half century.  Lucas, supra, at 4-8.  However, Hawaiian language schooling remained widely available when in 1893 a group of "American and European sugar planters, descendants of missionaries, and financiers" conspired with the United States Minister to cause the invasion of United States armed forces, ultimately "depos[ing] the Hawaiian monarchy and proclaim[ing] the establishment of a Provisional Government."  Pub. L. No. 103-150, 107 Stat. 1510 (1993).

### 2. Post-Overthrow Suppression

Three years after the overthrow, the newly formed Republic of Hawaiʻi enacted legislation officially declaring that "[t]he English language shall be the medium and basis of instruction in all public and private schools . . . . Any schools that shall not conform to the provisions of this section shall not be recognized by the Department."  Lucas, supra, at 8 (quoting Act of June 8, 1896, ch. 57, sec. 30 (codified in 1897 Haw. Comp. Laws at sec. 123)).  Contemporary sources suggest that the law was specifically intended to eradicate knowledge of ʻōlelo Hawaiʻi in future generations.  See id.  The number of

---

[7]  https://www.hawaiipublicschools.org/TeachingAndLearning/StudentLearning/HawaiianEducation/Pages/History-of-the-Hawaiian-Education-program.aspx [https://perma.cc/69PK-X4TB].

Hawaiian-medium schools dropped precipitously as a result of the legislation; 150 such institutions existed in 1880, and none remained by 1902.  Id. at 9.  Simultaneously, Hawaiian children and teachers were disciplined for speaking 'ōlelo Hawai'i in public school, with teachers in some instances even being dispatched to Hawaiian-speaking homes to reprimand parents for employing the language to speak to their children.  Id.

The law was largely successful at achieving its apparently intended effect.  Although the government instituted by the overthrow was replaced when Hawai'i was annexed by the United States and again when the islands achieved statehood, 'ōlelo Hawai'i newspapers, church services, and other cultural touchstones all but disappeared as native-speaking communities continued to dwindle.  Id. at 9-10.  Minor efforts to reintroduce 'ōlelo Hawai'i into the public school curriculum as a supplemental foreign language course did little to arrest its decline.  Id.  At its lowest point, there were as few as fifty native speakers of the language under the age of 18.  Native Hawaiian Law, supra, at 1274.  'Ōlelo Hawai'i was thus in danger of becoming a dead language when, in the 1970s, civil and indigenous rights movements across the nation coincided with a period of renewed interest in Native Hawaiian culture that became known as the Hawaiian Renaissance.  Id.; Courtenay W. Daum & Eric Ishiwata, From the Myth of Formal Equality to the

9

Politics of Social Justice: Race and the Legal Attack on Native Entitlements, 44 Law & Soc'y Rev. 843, 860–61 (2010).  During this period, a traditional Hawaiian proverb became popularized among advocates for the revitalization of 'ōlelo Hawai'i: "E ola mau ka 'ōlelo Hawai'i," which has been translated as "the Hawaiian language must live on."[8]

### 3. The 1978 Constitutional Convention

It was against the backdrop of the Hawaiian Renaissance that Hawai'i convened its 1978 Constitutional Convention.  The records of the convention are replete with the delegates' expressions of remorse that they had not learned more about Native Hawaiian cultural heritage during their upbringing, as well as their fear that such information would soon be lost as community elders died without passing on their knowledge.  See, e.g., II Proceedings of the Constitutional Convention of Hawai'i of 1978, at 427-30 (1980) (II Proceedings).  The convention adopted a number of measures aimed at embracing and revitalizing the Native Hawaiian culture, including a proposal containing several provisions specifically addressing 'ōlelo Hawai'i.

---

[8]     C. Kanoelani Nāone, 'O Ka 'Āina, Ka 'Ōlelo, A Me Ke Kaiāulu, 5 Hūlili: Multidisc. Res. on Hawaiian Well-Being 315, 322 (2008), https://www.ksbe.edu/_assets/spi/hulili/hulili_vol_5/O_ka_aina_ka_olelo_a_me_ ke_kaiaulu.pdf [https://perma.cc/2TS2-MWC6].  Other translations include "the Hawaiian language lives on," or "long live the Hawaiian language."  Id.

First, seeking to "overcome certain insults of the past where the speaking of Hawaiian was forbidden in the public school system, and of [the day] where Hawaiian [was] listed as a foreign language in the language department at the University of Hawaii," the framing delegates adopted an amendment giving ʻōlelo Hawaiʻi formal recognition as one of the State's official languages.[9]  Comm. of the Whole Rep. No. 12 in I Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 1016 (1980) (I Proceedings).  Second, the delegates sought to remedy the lack of opportunity to learn about Hawaiian language and culture through an amendment requiring the State to "provide for a comprehensive Hawaiian education program consisting of language, culture[,] and history as part of the regular curriculum of the public schools."  Stand. Comm. Rep. No. 57 in I Proceedings, at 637.  Specifically, the delegates stated that they intended this latter provision to, inter alia, "revive the Hawaiian language, which is essential to the preservation and perpetuation of Hawaiian culture."  Id.  The measure was combined with a proposal for a broader mandate that the State "promote the study of Hawaiian culture, history and language," and together they were adopted as a single amendment.  I Proceedings, at 273-74.

---

[9]     Today, the University of Hawaiʻi system classifies its Hawaiian language courses as part of its Hawaiian Studies department.  See generally Hawaiinuiākea School of Hawaiian Knowledge, https://manoa.hawaii.edu/hshk/ [https://perma.cc/5AFN-WJ8U].

Both the official language and the Hawaiian studies and education provisions were ratified by the electorate, and today they are respectively codified as article XV, section 4[10] and article X, section 4[11] of the Hawai'i Constitution.

### 4. Hawaiian Immersion Education

During the early 1980s, a group of Hawaiian language teachers formed 'Aha Pūnana Leo, Inc. ('Aha Pūnana Leo), a non-profit organization dedicated to the revival of 'ōlelo Hawai'i. 'Aha Pūnana Leo, Inc., A Timeline of Revitalization.[12]  Seeking to replicate the success of a similar program instituted by the Māori of New Zealand, 'Aha Pūnana Leo founded a number of "Kula Kaiapuni Hawai'i" preschools throughout the state.  Id.  As in the school system established by King Kamehameha III, instruction in the preschools was delivered entirely in 'ōlelo Hawai'i.  Id.  The goal of these "language nests" was to instill

---

[10]    Article XV, section 4 provides as follows: "English and Hawaiian shall be the official languages of Hawaii, except that Hawaiian shall be required for public acts and transactions only as provided by law."

[11]    Article X, section 4 provides as follows:

> The State shall promote the study of Hawaiian culture, history and language.

> The State shall provide for a Hawaiian education program consisting of language, culture and history in the public schools.  The use of community expertise shall be encouraged as a suitable and essential means in furtherance of the Hawaiian education program.

[12]    https://www.ahapunanaleo.org/en/index.php?/about/a_timeline_of_revitalization/ [https://perma.cc/8D2P-Q7WV].

fluency in ʻōlelo Hawaiʻi in a new generation at an age when children are most receptive to acquiring language skills. See id.

Simultaneously, the organization lobbied the Hawaiʻi legislature to grant formal status to the new Kula Kaiapuni Hawaiʻi preschools and to amend the successor to the 1896 English-only law in order to permit the use of ʻōlelo Hawaiʻi as a medium of instruction in public schools. Id. The group's initial efforts were unsuccessful, and upon entering kindergarten many of the preschools' first graduates were placed in limited English proficiency programs designed to accommodate immigrant children. Id. This led to a boycott and other direct activism, and in 1986, ʻAha Pūnana Leo successfully convinced the legislature to remove legal barriers to the preschools' operation. See 1986 Haw. Sess. Laws Act 79, § 1 at 104. The committee reports for the measure indicate the legislature found "support for the exemption in Article X, Section 4 of the State Constitution, which states that the State shall promote the study of Hawaiian culture, history and language, and in Article XV, Section 4 of the State Constitution, which prescribes Hawaiian and English as the official languages of the State." H. Stand. Comm. Rep. No. 745-86, in 1986 House Journal, at 1359. The reports further expressed in no uncertain terms the legislature's view that Hawaiian immersion education should be

allowed to grow: "As the survival of a culture is linked to the survival of its language, restricting the establishment of Hawaiian language programs is cultural and linguistic genocide." S. Stand. Comm. Rep. No. 411-86, in 1986 Senate Journal, at 955.

During the same legislative session, ʻAha Pūnana Leo successfully lobbied the legislature to authorize the Hawaiʻi Board of Education (the Board) to undertake "special projects using the Hawaiian language" that would be exempt from the normal requirements of English-language instruction. See 1986 Haw. Sess. Laws Act 47, § 1 at 50-51. The following year, the Board launched the Hawaiian Language Immersion Project, a two-year pilot program for children who wished to continue their education in ʻōlelo Hawaiʻi after graduating from ʻAha Pūnana Leo preschools. Lucas, supra, at 11. The program, which became known as Ka Papahana Kaiapuni ("Kaiapuni Educational Program"), was an immediate success; it was expanded to the second grade in 1988 and through the sixth grade in 1989. Id. In 1992, the Board of Education further expanded the program through the twelfth grade, incorporating an hour of English education every day after fourth grade, and the first Kaiapuni Educational Program class graduated from high school in June of 1999. Id.

Despite its success, funding for the Kaiapuni Educational Program remained static as the program grew, causing overall funding per student to decrease sharply. MacKenzie et

14

al., supra, at 1276.  The decline led the Office of Hawaiian affairs to file a series of lawsuits against the Department of Education in the mid-1990s seeking redress for the Department's failure to provide the Kaiapuni Educational Program with a "proper plan, resources, and teachers trained in Hawaiian-immersion education."  Id.  The litigation concluded in May 2000 with a settlement in which the two agencies agreed to implement a five-year joint funding plan.  Id. at 1278.  In recognition of this agreement and in order to "provide[] official legislative support to the Department's commitment to Hawaiian language immersion programs," the Hawai'i legislature in 2004 enacted a bill formally codifying a series of provisions governing the Kaiapuni Educational Program's operations.  S. Stand. Comm. Rep. No. 3144, in 2004 Senate Journal, at 1567; 2004 Haw. Sess. Laws Act 133, §§ 1-5 at 577-78.  Among other things, the law authorized the superintendent of education to provide either facilities for Hawaiian immersion education or transportation to the nearest schooling site at which Hawaiian immersion education is provided when fifteen or more qualified students in a school district wish to enroll in the Kaiapuni Educational Program. HRS § 302H-4 (2007).

In 2014 and 2015, the Board enacted and began to implement several new policies concerning Hawaiian education, including one overarching policy intended to govern the Kaiapuni

15

Educational Program.  According to this policy, the goal of the Kaiapuni Educational Program is, inter alia, "[t]o provide parents and student[s] a Hawaiian bicultural and bilingual education based upon a rigorous Hawaiian content and context curriculum."  Haw. State Bd. of Educ., Policy 2105: Ka Papahana Kaiapuni (2014).[13]  The policy further states that "[e]very student within the State of Hawaiʻi's public school system should have reasonable access to the Kaiapuni Educational Program." Id.  An Office of Hawaiian Education was formed within the Department of Education to administer the new policies, which the Department's website states are intended to help "the Department meet its obligations to . . . the Hawaiʻi State Constitution (Article X, Section 4 and Article XV, Section 4)." Haw. State Dep't of Educ., Hawaiian Education.[14]

The Kaiapuni Educational Program has continued to grow, and as of February 2016, Hawaiian immersion options existed at twenty-one sites throughout the state--fifteen under the Board's direct management and six at charter schools.[15]

---

[13]     https://boe.hawaii.gov/policies/2100series/Pages/2105.aspx [https://perma.cc/97V8-7C69].

[14]     https://www.hawaiipublicschools.org/TeachingAndLearning/ StudentLearning/HawaiianEducation/Pages/home.aspx [https://perma.cc/4QXK-TURU] (last visited June 3, 2019).

[15]     Based on the Hawaiʻi State Department of Education website, it appears that two additional Board-administered immersion sites have opened since the filing of this case, bringing the total number of immersion sites in the state to twenty-three.  See Haw. State Dep't of Educ., Hawaiian

(continued . . .)

Consequently, parents and children who wish to undertake schooling through the medium of ʻōlelo Hawaiʻi may seek enrollment in a K-12 immersion program on five of the major Hawaiian Islands: Oʻahu, Maui, Hawaiʻi Island, Molokaʻi, and Kauaʻi.

### 5. Hawaiian Immersion and Public Education on Lānaʻi

Public school students on the island of Lānaʻi are required to take courses related to Hawaiian history and culture over the course of their education, including "Pre-Contact Hawaiʻi History" in fourth-grade, "History of the Hawaiian Kingdom" in seventh-grade, and "Modern Hawaiian History" in high school. A Hawaiian language summer program has also been offered in recent years. However, there is currently no Kaiapuni Educational Program on Lānaʻi.

In December 2013, a community meeting was held in the cafeteria of Lānaʻi High and Elementary School (Lānaʻi School), the island's sole public school, to discuss implementing a Hawaiian language immersion program. The meeting generated considerable community interest and was attended by over a hundred people. A Hawaiian immersion stakeholders' group was

---

(. . . continued)

Language Immersion Program, https://www.hawaiipublicschools.org/ TeachingAndLearning/StudentLearning/HawaiianEducation/Pages/translation.aspx [https://perma.cc/NZ6M-KKAQ].

formed, and the group proceeded to engage with the school principal in the months following the meeting regarding the development of a Kaiapuni Educational Program on the island.

During these exchanges, the principal agreed to commit resources and a teacher position to the creation of an immersion program while allowing the stakeholders' group to plan its structure, including the initial grade levels to be covered and the immersion model to be adopted. The stakeholders' group originally made plans to establish one kindergarten and first-grade immersion class, but in February 2014 the group responded to strong continued interest from the community by expanding its request to include an additional second- and third-grade class. The principal expressed tentative support for the expanded proposal, pledging to seriously consider dedicating a second teacher position to the program.

For two-weeks in April 2014, a Lāna'i immersion teacher position was advertised internally with the Department of Education via the Teacher Assignment and Transfer Program. The only applicant during this period was the president of the stakeholders' group, an immersion teacher living on Maui who had strong family ties to Lāna'i and had for several years administered a Hawaiian language summer program on the island. In early May 2014, however, the applicant informed the principal by phone that she would be declining the position.

18

The school's subsequent efforts to recruit outside the Department were also unsuccessful; although the principal worked with the community to identify a number of possible teachers, each of the candidates either lacked the necessary skills and credentials to administer an immersion program or proved to be unwilling to relocate to Lānaʻi. Because an immersion program did not commence as planned, the principal hired Simon Tajiri, the former program manager of the Lānaʻi Cultural and Heritage Center, as a long-term substitute teacher to provide supplemental lessons on Hawaiian language, culture, and history to elementary school students. As of February 2016, recruitment efforts for a full-time immersion teacher remained ongoing.

According to the school principal, recruiting teachers to Lānaʻi is difficult due to the island's location; many teachers are not interested in moving to a geographically isolated area with limited access to housing, childcare, and other conveniences. The principal also asserts that the school is limited in the incentives it can offer--teacher's salaries are set by the collective bargaining agreement between the Board and the Hawaii State Teachers Association, as is statutorily required, and the school does not have the discretion to increase these amounts to attract new teachers. Although the collective bargaining agreement does provide for an additional pay differential for teachers employed at hard-to-staff schools,

19

this amount was limited to $1,500 per year of employment at the time of the events in this case.[16]

### B. The Present Case

### 1. The Clarabals' Move to Lānaʻi

Prior to August 2013, Chelsa-Marie Kealohalani Clarabal moved to Lānaʻi with her husband and children, including her two young school-age daughters. In or around August 2013, the two Clarabal daughters respectively enrolled in second-grade and kindergarten at Lānaʻi School.

Although Clarabal is Native Hawaiian and states that her great grandmother was fluent in ʻōlelo Hawaiʻi, her grandmother was discouraged from speaking the language or teaching it to her children, and English is therefore the primary language spoken in the Clarabal family home. Because Clarabal viewed it as fundamental to her cultural identity that her daughters learn their ancestors' language, the two daughters had been enrolled in the Kaiapuni Educational Program at Pāʻia Elementary School on the island of Maui prior to moving to Lānaʻi. Consequently, both daughters were able to read and write

---

[16] The differential was increased to $3,000 per year of employment on July 1, 2015. Also, HRS § 302A-630 (2007), which was amended by the 2004 Kaiapuni Educational Program legislation, authorizes the Department of Education to provide "additional benefits" to "[t]eachers in Hawaiian language medium education whose responsibilities are greater or unique and require additional language skills."

only in 'ōlelo Hawai'i when they began attending Lāna'i School at the beginning of the 2013-14 school year.

The daughters faced difficulties at Lāna'i School as a result of this language barrier, and Clarabal unsuccessfully requested that the school assign an educational assistant to assist one of her daughters after she was reprimanded for responding to a written assignment in 'ōlelo Hawai'i.[17]  Clarabal began attending some of the meetings between the school principal and the stakeholders' group regarding the creation of a Hawaiian immersion program, and in late April 2014 she was informed that her younger daughter had been accepted into the school's first immersion class, which would be held the following school year.  When the 2014-15 school year began, however, no Hawaiian immersion class commenced.  Instead, the daughters were respectively assigned to first- and third-grade classrooms for which no permanent teachers were provided, with the vice-principal and various substitute teachers instead teaching the classes on a temporary basis.

---

[17]    Additionally, one of Clarabal's daughters was made to repeat a grade upon transferring to Lāna'i School.  The record is unclear as to whether this was the result of difficulties arising from the transition from Hawaiian immersion education to English standard schooling.

## 2. Circuit Court Proceedings

On October 24, 2014, Clarabal filed a complaint in Circuit Court for the First Circuit[18] (circuit court) on behalf of herself and her daughters against the Hawaiʻi Department of Education, the Board, and the members of the Board in their official capacities (collectively, "the State").[19]  In her prayer for relief, Clarabal sought a declaration that the failure to provide a Hawaiian immersion program and a stable teacher workforce on Lānaʻi violated her children's rights under the Hawaiʻi Constitution, as well as an order compelling the State to develop a plan to implement a Kaiapuni Educational Program and ensure consistent staffing at Lānaʻi School.  Specifically, Clarabal alleged in Count 2 of her complaint that by failing to establish a Hawaiian immersion program on Lānaʻi that her daughters could attend, the State had breached the duty to provide a Hawaiian education program in public schools imposed by article X, section 4 of the Hawaiʻi Constitution.[20]

---

[18]    The Honorable Virginia L. Crandall presided.

[19]    During the pendency of this proceeding, many of the original defendants were succeeded in their official capacity by new office holders. Thus, pursuant to Hawaiʻi Rules of Appellate Procedure Rule 43(c)(1) (2010), the new office holders have been substituted as parties to this case.

[20]    Clarabal also alleged in her complaint that the State's failure to address the teacher shortage and provide instruction in ʻōlelo Hawaiʻi violated the State's obligation to provide a statewide system of public schools under article X, section 1 of the Hawaiʻi Constitution, as well as the same provision's prohibition on discrimination in public education; [ROA v.1 19:33] that the speaking of ʻōlelo Hawaiʻi is a traditional and customary

(continued . . .)

On February 26, 2016, the State filed two motions for partial summary judgment collectively covering all counts in Clarabal's complaints. On March 17, 2016, Clarabal filed a cross-motion for partial summary judgment on all counts requesting that the court declare as a matter of law that the State has a duty and obligation to provide access to a Hawaiian language immersion program to her daughters.

With respect to Count 2, the State argued that article X, section 4 does not on its face establish an individually enforceable right to Hawaiian immersion education. This reading is confirmed by excerpts from the records of the 1978 Constitutional Convention, the State contended, which suggest the provision was intended to preserve and perpetuate Hawaiian culture by ensuring Hawaiian history, culture, and language are integrated into the "regular curriculum" of public schools that is typically taught in English. (Citing Stand. Comm. Rep. No. 57 in I Proceedings, at 637-38.) The State further argued that

Native Hawaiian right secured by article XII, section 7 of the Hawai'i Constitution, and that the State's failure to provide a Lāna'i-based immersion program or to account for the costs of an immersion education when allocating funding violated the State's duty to protect such rights; [ROA v.1 19:35-36] that her children have a fundamental right to an adequate public school education protected by the due process clause of article I, section 5 of the Hawai'i Constitution, and the State deprived them of this right by failing to maintain a stable teacher workforce at Lāna'i School; and that the high teacher turnover rate also violates article I, section 5's equal protection clause due to its disparate negative impact on children living on Lāna'i.

the text and history of article XV, section 4 of the Hawaiʻi Constitution, which establishes Hawaiian as an official language of the state, make clear that the delegates intended the State to have discretion to consider the budget and other constraints when determining which official services would be offered in ʻōlelo Hawaiʻi. (Citing Stan. Comm. Rep. No. 57 in I Proceedings, at 638.)

The State maintained that the standard Hawaiian history classes as well as the supplemental Hawaiian instruction by Tajiri are sufficient to spark students' interests and inspire them to take Hawaiian language electives, and that the classes and instruction thus contribute to the revival of ʻōlelo Hawaiʻi as the convention delegates intended. The classes therefore meet the State's article X, section 4 obligation to provide a Hawaiian education program in public schools, the State concluded.

In her opposition to the State's motions and in her motion for partial summary judgment, Clarabal contended that the convention history indicates the delegates intended article X, section 4 to require that the State provide a "comprehensive Hawaiian education program" sufficient to revive the Hawaiian language. (Citing, inter alia, Comm. of the Whole Rep. No. 11 in I Proceedings, at 274; Stand. Comm. Rep. No. 39 in I Proceedings, at 586, 590; Stand. Comm. Rep. No. 57 in I

24

Proceedings, at 637.)  Attached to Clarabal's motion for partial summary judgment were a number of exhibits detailing the opinions of academics specializing in linguistics and Hawaiian studies regarding the importance of Hawaiian immersion education.

These exhibits included a declaration by William O'Grady, a Professor of Linguistics of the University of Hawai'i at Manoa who specializes in language revitalization.  The declaration stated that the United Nations Educational, Scientific and Cultural Organization currently classifies 'ōlelo Hawai'i as a severely endangered language, meaning that immediate remedial action is needed to prevent its extinction.  Professor O'Grady further opined that relying on school-based language immersion programs in which children have the opportunity to hear and use the language for several hours a day is "the only realistic course of action" to revive the language.  He stated that research on bilingualism indicates that children should receive at least twenty-five to thirty percent of their language input in the second language to achieve fluency.  The "modest program of instruction" currently offered at Lāna'i School is not sufficient to reach this benchmark, Professor O'Grady concluded, and the chances of the children enrolled there achieving fluency through the current program are "negligible."

Clarabal attached an additional deposition of Professor O'Grady to her reply brief in which he reiterated the necessity of Hawaiian immersion education for reviving 'ōlelo Hawai'i. Professor O'Grady stated that "[t]he only hope of saving ['ōlelo Hawai'i], preserving it, perpetuating it is to introduce it in the school," and that the level of instruction required is "not 1 or 2 or 3 hours a week. It's got to be full-fledged exposure, the sort you get in an immersion program." He estimated that four to four-and-a-half hours a day of Hawaiian language input in school is necessary for a child to become reasonably fluent in 'ōlelo Hawai'i. He further elaborated that offering an immersion program is "the least we can do to try to revitalize language" and that while other measures can supplement an immersion program, they could not replace it. The immersion program is not "the gold standard" for language revitalization, Professor O'Grady concluded, but rather "the minimum standard." Specifically addressing the supplemental lessons offered by Tajiri at Lāna'i school, Professor O'Grady stated that they were not providing any movement toward revitalization because they are "not an effective way to make the children fluent in the Hawaiian language."

Also attached to Clarabal's motion for partial summary judgment was a second declaration made by Stanley H. "Kī'ope" Raymond II, a member of the Board of Directors of 'Aha Pūnana Leo

and an associate professor of Hawaiian Studies at University of Hawai'i Maui College. Professor Raymond stated that a well-documented reemergence of 'ōlelo Hawai'i has occurred since the Kaiapuni Educational Program was first implemented in public schools. Professor Raymond further declared that it is well accepted within his academic field that the offering of Hawaiian immersion programs in the public school system "is absolutely necessary to ensure the preservation of 'ōlelo Hawai'i for use by future generations."

Following oral argument, the circuit court orally granted the State's motions for partial summary judgment and denied Clarabal's motion for partial summary judgment. With respect to Count 2, the court found that "Article X, Section 4, the Hawaiian education clause does not establish a constitutional right to an immersion program." The court ruled that the reports from the 1978 Constitutional Convention made it "clear that a comprehensive Hawaiian education program consisting of language, culture and history as part of the regular curriculum in the public schools is what is required." The education offered by the State at Lāna'i School, coupled with the State's legitimate efforts to establish a Lāna'i-based

Hawaiian immersion program, were sufficient to meet this constitutional obligation, the court found.[21]

The circuit court's written order and final judgment were entered on June 7, 2016. Clarabal filed a timely notice of appeal, followed by an application to this court for transfer. On January 26, 2017, this court accepted transfer.

## II. STANDARD OF REVIEW

This court reviews questions of law de novo. Bank of Hawaii v. DeYoung, 92 Hawaiʻi 347, 351, 992 P.2d 42, 46 (2000). This includes a trial court's grant or denial of summary judgment. Yoneda v. Tom, 110 Hawaiʻi 367, 371, 133 P.3d 796, 800 (2006). Similarly, we exercise "our own 'independent constitutional judgment'" when interpreting constitutional provisions. Ka Paʻakai O KaʻAina v. Land Use Comm'n, State of Hawaiʻi, 94 Hawaiʻi 31, 41, 7 P.3d 1068, 1078 (2000) (quoting State v. Sua, 92 Hawaiʻi 61, 68, 987 P.2d 959, 966 (1999)).

---

[21] The court also determined that the State had met its article X, section 1 obligation to provide for a statewide system of public schools; that caselaw interpreting the traditional and customary rights clause of article XII, section 7 had applied it only to prevent the State from interfering with the exercise of certain Native Hawaiian practices on undeveloped land, which was not at issue in this case; and that the alleged teacher shortage on Lānaʻi did not violate equal protection or substantive due process because there was no showing that Lānaʻi School's use of substitute teachers resulted in an inadequate education and various indicators of school performance in fact indicated the State had provided an adequate education.

### III. DISCUSSION

Before this court, Clarabal argues, inter alia, that the circuit court erred in granting the State's motion for partial summary judgment and denying her own because article X, section 4 of the Hawai'i Constitution obligates the State to provide her daughters with access to a Hawaiian immersion program.[22]  As we have often stated, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Hawaii Cmty. Fed. Credit Union v. Keka, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (quoting Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 103, 839 P.2d 10, 22 (1992)).  In making this evaluation, we view the evidence in the light most favorable to the non-moving party.  Id. (citing State ex rel. Bronster v. Yoshina, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997)).

---

[22]  There is some discrepancy between the language used in Clarabal's motion for partial summary judgment and that employed in the filings to this court.  While below Clarabal requested a declaration that the State is constitutionally obligated to provide her daughters with access to a Hawaiian immersion program, the briefs on appeal request a declaration that the State must provide reasonable access to a Hawaiian immersion program.  As discussed infra, note 34, we interpret these requested remedies to have two distinct meanings.  We review the language of Clarabal's motion for partial summary judgment for purposes of this appeal.

29

"We have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent." Hirono v. Peabody, 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996) (quoting Convention Ctr. Auth. v. Anzai, 78 Hawai'i 157, 167, 890 P.2d 1197, 1207 (1995)). The starting point for determining this intent is the text of "the instrument itself." State v. Kahlbaun, 64 Haw. 197, 201, 638 P.2d 309, 314 (1981).

Article X, section 4 of the Hawai'i Constitution provides as follows:

> The State shall promote the study of Hawaiian culture, history and language.
>
> The State shall provide for a Hawaiian education program consisting of language, culture and history in the public schools. The use of community expertise shall be encouraged as a suitable and essential means in furtherance of the Hawaiian education program.

The State contends that the provision makes no direct mention of Hawaiian immersion education, but rather simply a "Hawaiian education program." Thus, the State argues, article X, section 4 requires only that the State provide public school students with "exposure to and some instruction in Hawaiian language, history and culture." The manner in which students are exposed to Native Hawaiian studies is a non-justiciable policy decision left to the State's discretion, the State

30

continues, and the courses and instruction currently offered at Lāna'i School are thus sufficient to fulfill the State's obligations.

The initial two clauses of article X, section 4 are phrased in broad terms. The first, the Hawaiian Studies clause, obliges the State to "promote the study of Hawaiian culture, history and language." A conventional dictionary defines "promote" as "to help bring (something, such as an enterprise) into being."[23] The second, the Hawaiian Education clause, requires the State to "provide for a Hawaiian education program consisting of language, culture and history in the public schools." "Program" is conventionally defined as "a plan or system under which action may be taken toward a goal."[24] Thus, the plain text of the provisions require the State to (1) actively bring about the growth of Hawaiian culture, history, and language studies; and (2) establish a system in public schools that provides students an education consisting of Hawaiian language, culture, and history. The clauses neither spell out the methods the State must use in achieving these ends, nor do they expressly leave this determination to the

---

[23] Promote, Merriam-Webster, https://www.merriam-webster.com/dictionary/promote [https://perma.cc/CN54-Z4UT].

[24] Program, Merriam-Webster, https://www.merriam-webster.com/dictionary/program [https://perma.cc/K4YV-E5XA].

State.  They are ambiguous in this regard, and "extrinsic aids may [therefore] be examined to determine the intent of the framers and the people adopting the proposed amendment." Kahlbaun, 64 Haw. at 201–02, 638 P.2d at 314.

The standing committee report by the Committee of Hawaiian Affairs on the proposal that would eventually become article X, section 4 contains several indications that the framers intended the provision to require the State to implement a Hawaiian education program in public schools that exceeds the minimum standards argued for by the State.  The report states that the "Committee decided to adopt this amendment to the Constitution in order to insure that there is a comprehensive Hawaiian education program consisting of language, culture and history as part of the regular curriculum of the public schools."  Stand. Comm. Rep. No. 57 in I Proceedings, at 637 (emphasis added).  The Committee's use of the word comprehensive is telling; the term is commonly defined as "covering completely or broadly."[25]  Later, the report refers to the program as an "intensive study."  Id. at 638.  It is thus clear that the Hawaiian education program contemplated by the provision encompasses more than minimal "exposure to and some instruction in Hawaiian language, history and culture," as contended by the

---

[25]    Comprehensive, Merriam-Webster, https://www.merriam-webster.com/dictionary/comprehensive [https://perma.cc/3KMA-843D].

State.  Rather, the framers intended the clause to ensure that students have the opportunity to study Hawaiian language, history, and culture in an in-depth and expansive manner if they so choose.[26]

Further, "a constitutional provision must be construed . . . in the light of the circumstances under which it was adopted and the history which preceded it."  Hawai'i State AFL-CIO v. Yoshina, 84 Hawai'i 374, 376, 935 P.2d 89, 91 (1997) (quoting Carter v. Gear, 16 Haw. 242, 244 (Haw. Terr. 1904)); see also Nelson v. Hawaiian Homes Comm'n, 127 Hawai'i 185, 198, 277 P.3d 279, 292 (2012) (holding that this court must consider "the history of the times and the state of being when the constitutional provision was adopted" (quoting Kahlbaun, 64 Haw. at 202, 638 P.2d at 315))).  Specifically, "the object sought to be accomplished and the evils sought to be remedied should be

---

[26]  The dissent reads much into the fact that the terms "comprehensive" and "as part of the regular curriculum" were removed from the original text of article X, section 4 when the Committee of Hawaiian Affairs' proposal was combined with the Committee on Education's proposal.  The dissent argues that this indicates the framers did not intend "to require the State to provide a specialized, intensive Hawaiian language immersion program" but rather wished to grant the State flexibility to implement the program as it saw fit.  Dissent at 10.  The deletion of the phrases appears to be a purely stylistic change, however.  There is no mention of the alteration in the floor debates or committee reports of the Convention.  Moreover, the committee reports accompanying article X, section 4 specifically describe the envisioned program as "comprehensive" and "intensive."  Stand. Comm. Rep. No. 57 in I Proceedings, at 637-38.  It is this concrete documentation of the framers' intent that guides our interpretation of article X, section 4 and not speculation regarding the hidden purpose of an effort by the drafters to use more concise language.

kept in mind by the courts." Nelson, 127 Hawai'i at 198, 277 P.3d at 292 (quoting Hawaii Gov't Emps.' Ass'n v. Cty. of Maui, 59 Haw. 65, 81, 576 P.2d 1029, 1039 (1978)).

As discussed supra, the 1978 Constitutional Convention was convened during the Hawaiian Renaissance, a time of renewed interest in Hawaiian culture following a long period in which learning about traditional Hawaiian language and history in schools was at best shallow, sporadic, and undirected and at worst discouraged or forbidden. See II Proceedings, at 428 (statement of Del. Nozaki). The debates of the Committee of the Whole during this Convention provide clear evidence of the specific evil the delegates intended article X, section 4 to remedy; the delegates repeatedly and expressly stated that the proposal that would become article X, section 4 was designed to correct the lasting effects of the campaign of suppression that had deprived them and their families of the opportunity to become fluent in 'ōlelo Hawai'i. Delegate Kaapu related the story of his father, who grew up in a small district served by a single school in which students "were prohibited from speaking the Hawaiian language" and were "made to do detention . . . . pulling weeds" if they were caught. Id. at 429 (statement of Del. Kaapu). He then stated that during his own childhood, he did not have the chance to learn 'ōlelo Hawai'i, and that his own son was only then learning the language on his own from a

34

"language book." Id. at 430. Delegate Chung similarly related that, when he took Hawaiian as a freshman at the University of Hawai'i, his class had "eight Kamehameha graduates and none of them knew Hawaiian." Id. at 431 (statement of Del. Chung). Delegate Hale stated that he had engaged in protest so that his son could go to "the only school located in the whole State of Hawai'i that taught Hawaiian in the fourth grade," and that even in this school his son was unable to learn more than a superficial amount of the language. Id. at 431 (statement of Del. Hale).[27]

Ultimately, we need not speculate about the manner in which the framers sought to make amends for the historical campaign of suppression because the records of the convention are explicit as to the goals they intended the Hawaiian education program required by article X, section 4 to achieve:

> This section is intended to [] insure the general diffusion of Hawaiian history on a wider basis, to recognize and

---

[27] That the delegates sought to remedy the state of affairs brought about by the historical suppression of the Hawaiian language is further demonstrated by the history of article XV, section 4, the clause making Hawaiian an official language of the State of Hawai'i, which was part of the same proposal as article X, section 4. As related, the Committee of the Whole report addressing the proposal states that the provision was adopted "to overcome certain insults of the past where the speaking of Hawaiian was forbidden in the public school system, and of today where Hawaiian is listed as a foreign language in the language department at the University of Hawaii." Comm. of the Whole Rep. No. 12 in I Proceedings, at 1016. This history may guide our interpretation of article X, section 4 because, as we have long held, "a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it." Yoshina, 84 Hawai'i at 376, 935 P.2d at 91 (quoting Carter, 16 Haw. at 244).

> preserve the Hawaiian culture which has contributed to, and in many ways forms the basis and foundation of, modern Hawaii, and <u>to revive the Hawaiian language, which is essential to the preservation and perpetuation of Hawaiian culture</u>.

Stand. Comm. Rep. No. 57 in I Proceedings, at 637 (emphases added). Article X, section 4 was thus adopted for the express purpose of, inter alia, reviving the Hawaiian language.[28]

Taken together, the records of the 1978 Constitutional Convention make clear that the framers intended article X, section 4 to require the State to provide a Hawaiian education program in public schools that is reasonably calculated to revive and preserve ʻōlelo Hawaiʻi. By doing so, they hoped to rectify the ill effects of the historic suppression of the language.[29]

---

[28] In this context, we interpret the term "revive" to mean that the language is actively spoken and no longer in danger of extinction. This generally parallels the standards that Professor O'Grady stated the United Nations Educational, Scientific, and Cultural Organization and the Endangered Language Catalogue employ to identify "safe" languages. These identifying characteristics include that intergenerational transmission of the language occurs without interruption and that the number of speakers is stable or growing.

[29] The dissent implies that the language of article X, section 4 is unambiguous, obviating the need for this court to consult extrinsic evidence to determine the framers' intent. Dissent at 6. The plain text of the provision requires only that the State must provide a Hawaiian education program consisting of language, culture, and history in public schools, the dissent maintains. Dissent at 6. Yet the dissent states that there is a role for courts in "evaluating the adequacy of the State's Hawaiian Education program" and posits that, if properly raised, "we could decide whether the State's current program passes constitutional muster." Dissent at 13-14. The dissent avoids making such an evaluation by arguing that Clarabal's motion for partial summary judgment requested only that the court rule on whether the State has an obligation to provide access to a Hawaiian immersion program. Dissent at 14. But Clarabal challenges on appeal not only the circuit court's denial of her own motion for partial summary judgment but also that court's grant of the State's motions for partial summary judgment.

(continued . . .)

The State's position--that any exposure to Hawaiian language, history, and culture is sufficient to satisfy its constitutional obligations, and that the specific manner of exposure is left to the State's discretion--is fundamentally incompatible with the framers' intention.  Indeed, under the State's formulation, it could do away with the Kaiapuni Educational Program entirely and instead satisfy its constitutional obligations with a program that the record demonstrates is indisputably inadequate to revive and preserve 'ōlelo Hawai'i.  This is precisely the outcome the delegates adopted article X, section 4 to prevent.

---

(. . . continued)

As the dissent acknowledges, Clarabal has repeatedly made reference to the inadequacy of the Hawaiian education program at Lāna'i school, thus making it necessary to consider this matter in determining whether summary judgment was properly granted to the State on all counts.  Dissent at 14.

In any event, the dissent's acknowledgment that some standard exists by which courts can evaluate the constitutional adequacy of the State's Hawaiian education program is an implicit concession that article X, section 4 imposes unwritten requirements not enumerated in the ostensibly clear text of the provision.  Otherwise, any program that encompassed some trace of each of the three listed components would satisfy the State's constitutional mandate regardless of whether it was otherwise adequate.  And, even were we to agree that article X, section 4's broad terms support the degree of discretion argued for by the dissent and claimed by the State, the "settled rule" that words in a constitutional provision are presumed to be used in their conventional sense applies "unless the context furnishes some ground to control, qualify, or enlarge" the terms.  Pray v. Judicial Selection Comm'n of State, 75 Haw. 333, 342, 861 P.2d 723, 727 (1993) (quoting Cobb v. State, 68 Haw. 564, 565, 722 P.2d 1032, 1033 (1986)).  Given the historical context in which article X, section 4 was enacted, there is ample evidence that the framers did not intend that the constitutional provision would be satisfied by any exposure of school children to Hawaiian language, history, and culture, no matter how minimal.

The dissent disagrees with this analysis. It contends that determining the details of the Hawaiian education program mandated by article X, section 4 is a "responsibility [] best left to the Legislature, not the courts," and that the legislature has made such a determination by enacting HRS Chapter 302H. Dissent at 11, 14 n.5. As a threshold matter, any implication that HRS Chapter 302H requires that the State maintain the Kaiapuni Educational Program is contradicted by the terms of the statutes, which authorize the State to create a Hawaiian immersion program but do not mandate that it do so.[30]

But more importantly, although the dissent is correct that the legislature may play an important role in defining the specific details of the Hawaiian education program required by article X, section 4, the delegates did not draft the provision to allow legislative enactments to alter or qualify the central requirement that the State provide a Hawaiian education program that is constitutionally adequate. This approach directly

---

[30] See HRS § 302H-1 (2007) ("The Hawaiian language medium education program may be established as a complete educational program or schooling experience provided to students in the medium of the Hawaiian language." (emphasis added)); HRS § 302H-3 (2007) ("The department of education may create a separate office of Hawaiian language medium education for the direction and control of the program." (emphasis added)); HRS § 302H-4 ("When fifteen or more qualified children in any one departmental school district wish to enroll in the Hawaiian language medium education program, the superintendent of education may provide facilities for a Hawaiian language medium education program or provide transportation to the nearest schooling site providing the program, including a charter school site or laboratory school site." (emphasis added)).

contrasts with that taken by the delegates with regard to the constitutional provision that made Hawaiian an official language of the state, which was considered and enacted at the same time as article X, section 4.  That is, unlike in the Hawaiian Education clause, the framers expressly stated that "English and Hawaiian shall be the official languages of Hawaii, except that Hawaiian shall be required for public acts and transactions only as provided by law."  Haw. Const. art. XV, sec. 4 (emphasis added); see also, e.g., Haw. Const. art. XI, sec. 9 ("Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality . . . ." (emphasis added)).

Thus, the delegates did not intend that the requirements of the program would be solely defined by legislative enactments.  Instead, they intended the core requirement that the State provide a constitutionally adequate Hawaiian education program to be defined by this court's interpretation, for it is "the courts, not the legislature, [who] are the ultimate interpreters of the Constitution."  In re Application of Maui Elec. Co., 141 Hawaiʻi 249, 268 n. 33, 408 P.3d 1, 20 n.33 (2017) (quoting State v. Bani, 97 Hawaiʻi 285, 291 n.4, 36 P.3d 1255, 1261 n.4 (2001)).  And, as stated, "we have long recognized that the Hawaii Constitution must be construed with due regard to the intent of the framers and the

people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent."  Sierra Club v. Dep't of Transp. of Hawai'i, 120 Hawai'i 181, 196, 202 P.3d 1226, 1241 (2009) (quoting Hanabusa v. Lingle, 105 Hawai'i 28, 31-32, 93 P.3d 670, 673-74 (2004)).

It is true that the delegates to the 1978 Constitutional Convention lacked the benefit of subsequent academic research on the revitalization of languages, and they may not have anticipated the contours of a Hawaiian education program reasonably calculated to revive 'ōlelo Hawai'i under current circumstances.  Yet, as Justice Stone of the United States Supreme Court said in a passage that has been approvingly quoted by members of this court:

> [I]n determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar.  For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses.  Hence we read its words, not as we read legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government. If we remember that it is a Constitution we are expounding, we cannot rightly prefer, of possible meanings of its words, that which will defeat rather than effectuate the Constitutional purpose.

Emps.' Ret. Sys. of Hawaii v. Ho, 44 Haw. 154, 170-71, 352 P.2d 861, 870 (1960) (opinion of Marumoto, J.) (quoting United States v. Classic, 313 U.S. 229, 316 (1941) (emphases added and internal quotes omitted); cf. State v. O'Brien, 68 Haw. 38, 44,

704 P.2d 883, 887 (1985) ("[T]he mandate of the constitution must accord with the changing circumstances of modern times and the exigencies of life in a society dependent on technology such as the automobile.").

Thus, the specifics of the Hawaiian education program required by article X, section 4 have evolved through time and will continue to be refined as circumstances and the state of human knowledge about reviving and preserving language changes. What is key is that the program effectuates the constitutional purpose of article X, section 4 by being reasonably calculated to revive ʻōlelo Hawaiʻi.[31]

The State and the trial court made much of the Committee of Hawaiian Affair's statement that the instruction is to be "part of the regular curriculum of the public schools," apparently interpreting "regular" as synonymous with "ordinary"

---

[31] The dissent's repeated assertion that "the framers [did not] intend[] Hawaiian language immersion to be a required component of the Hawaiian Education program" is therefore ultimately irrelevant to the outcome of this case. Dissent at 6-7, 10-11; cf. McCleary v. State, 269 P.3d 227, 251 (2012) ("While the [State] has long recognized these offerings as central to the basic education program, they are not etched in constitutional stone as part of the definition of 'education.' The [State] has an obligation to review the basic education program as the needs of students and the demands of society evolve. From time to time, the [State] will need to evaluate whether new offerings must be included in the basic education program. Likewise, the importance of certain programs or offerings may prove less compelling over time."). As in McCleary, the State has a constitutional obligation to routinely review the details of the Hawaiian education program to ensure it is compliant with the mandates of article X, section 4 as society evolves, enacting such changes as may be needed for the program to be reasonably calculated to revive the Hawaiian language under circumstances as they then exist.

or "standard." Yet "regular" also means "recurring, attending, or functioning at fixed, uniform, or normal intervals," and further examination of the committee report indicates that it is this latter meaning that was intended.[32] The Committee lamented that "[p]resently Hawaiian courses are part of a larger program called social studies" and, as part of this program, "the required units of Hawaiian courses cast a small shadow which is soon lost in the wave of western standards." Stand. Comm. Rep. No. 57 in I Proceedings, at 637. The Committee thus intended article X, section 4 to insure that Hawaiian studies were offered consistently throughout the course of schooling and not as special, one time units within a broader academic program. This is what was intended by the Committee's reference to the "regular curriculum" of public schools, and the provision does not require that Hawaiian studies be conducted in the same manner as other courses.[33]

This case comes before this court on a motion for summary judgment, and the undisputed evidence in the record

---

[32] Regular, Merriam-Webster, https://www.merriam-webster.com/dictionary/regular [https://perma.cc/U2C5-6VKR].

[33] Indeed, under the State's formulation, the Kaiapuni Educational Program would not be a valid method of satisfying the State's article X, section 4 obligations, as it is a nonstandard method of instruction. This is contrary to the State's acknowledgment that a Hawaiian immersion program "represents another means by which the State could introduce intensive instruction in Hawaiian language, history, and culture into the classroom[,] [b]ut it is not the only or exclusive means of satisfying Article X, Section 4's mandate."

demonstrates that providing reasonable access to a Hawaiian immersion program in public schools is necessary to the revival of ‘ōlelo Hawai‘i.[34]  As related above, William O'Grady, a linguistics professor specializing in language revitalization, stated repeatedly and emphatically in his declaration and deposition that a language immersion program in which children receive at least twenty-five to thirty percent of their language exposure in ‘ōlelo Hawai‘i is currently "the only realistic course of action" to revive the language and preserve it for future generations.[35]  He explained that providing reasonable access to an immersion program is not "the gold standard" for language revitalization, but rather "the minimum standard." This conclusion was echoed by Stanley H. "Kī‘ope" Raymond II, a professor of Hawaiian Studies, who stated that it is well accepted within his field that offering a Hawaiian immersion

---

[34]    We use the phrase "reasonable access," which is employed by the Board in its policy governing the Kaiapuni Educational Program, to mean that the State must take all reasonable measures to provide access.  What constitutes reasonable access to a Hawaiian immersion program may vary based on the circumstances, but the State must consider any reasonable alternative and provide access if such an alternative exists.

[35]    Professor O'Grady stated that one reason immersion education is currently the only realistic option for reviving ‘ōlelo Hawai‘i is that the language is no longer being learned by children in the home through intergenerational transmission and no ideal "language pill" exists.  A time may come where intergenerational transfer of ‘ōlelo Hawai‘i is restored or a more effective instructional technique is discovered and reasonable access to Hawaiian immersion education is no longer essential to the revival and preservation of the language.  As stated, what article X, section 4 requires is not specifically Hawaiian immersion education, but rather a Hawaiian education program reasonably calculated to revive and preserve ‘ōlelo Hawai‘i.

education option in the public school system "is absolutely

necessary to ensure the preservation of 'ōlelo Hawai'i for use by

future generations."  The State offered no testimony or

declarations disputing this evidence.[36]

Rather, the State argued below that exposing students

to basic Hawaiian language, culture, and history through classes

and instruction like those currently offered at Lāna'i School

could increase student interest in the Hawaiian language and

induce some student to seek out additional instruction, thereby

reviving 'ōlelo Hawai'i.[37]  But this claim is unsupported by the

_____

[36]    The State points to the declaration of the Director of the Office
of Hawaiian Education stating that the "Hawaiian language can be taught
through the medium of English the same way other foreign languages are
taught."  As an initial matter, the delegates to the 1978 Constitutional
Convention specifically stated when making 'ōlelo Hawai'i an official language
of the State that they were seeking to overcome the "insult" of 'ōlelo Hawai'i
being regarded as a foreign language in schools, and the language should
receive due consideration for its special connection to the Hawaiian Islands
even when taught through standard English instruction.  See supra note 27.
Moreover, this misconstrues the State's obligation under article X, section
4.  The question is not whether 'ōlelo Hawai'i can be taught using techniques
other than Hawaiian immersion education.  It is whether a Hawaiian education
program that does not include reasonable access to Hawaiian immersion
education can result in the revitalization of 'ōlelo Hawai'i.  The
uncontroverted evidence in the record indicates it cannot.  See also William
H. Wilson and Keiki Kawai'ae'a, I Kumu; I Lālā: "Let There Be Sources; Let
There Be Branches", 46 J. Am. Indian Educ. 37, 38 (2007) ("Over eighty years
of teaching Hawaiian as a second/foreign language in English medium
educational structures have shown that Hawaiian cannot be revitalized in that
way.  The life of a language exists in the system of structures, not in the
instruction of content.").

[37]    By contrast, the concurring opinion concludes that the Hawai'i
Constitution obligates the State to provide each student who wishes to learn
'ōlelo Hawai'i "with a reasonable opportunity to become fluent in the language
during the course of the student's public education."  Concurrence at 12.
But simply providing the opportunity for students to become fluent in 'ōlelo
Hawai'i does not on its own satisfactorily address the underlying purpose of
article X, section 4 of the constitution--"to revive the Hawaiian language,

(continued . . .)

evidence in the record.  Professor O'Grady specifically rejected the contention that the instruction currently offered at Lāna'i School is "moving towards revitalization."  Indeed, he stated that the lessons may in fact be detrimental to the effort by misleading parents into believing that their child will become fluent from the lessons, causing them to forego more adequate instruction.

On the record before us, there is no disputed issue of material fact that providing reasonable access to a Hawaiian immersion program is an essential component of any Hawaiian education program reasonably calculated to revive and preserve 'ōlelo Hawai'i, and it is thus required by article X, section 4.[38]

---

(. . . continued)

which is essential to the preservation and perpetuation of Hawaiian culture." Stand. Comm. Rep. No. 57 in I Proceedings, at 637.  Under the concurring opinion's formulation, the State might seek to provide a reasonable opportunity to become fluent by offering students access to computer programs, after-school instruction, traditional language classes, or various combinations thereof.  But the unrefuted expert testimony in this case established that these measures are not alone sufficient to revive the Hawaiian language and would thus fall short of accomplishing the framers' intent.

[38]     The dissent faults our holding for mandating only that the State undertake all reasonable efforts to provide access to an immersion program, suggesting that such efforts may not be sufficient to revive and preserve 'ōlelo Hawai'i.  Dissent at 9 n.2.  But as Professor O'Grady stated, "[t]here's no specific number" of speakers that are required to revitalize 'ōlelo Hawai'i, and rather, "[t]he question from a linguistic perspective is how can we produce any, or even better[,] many young people who speak the language fluently enough to be comfortable in it and don't simply see it as a subject that you learn in school, but see it as a mode of communication that can be used in all of their life activities."  He explained that reviving the language is a "long-term" undertaking, and that the role of the education system is to "keep[] feeding people into the system" through "ongoing efforts . . .to produce more and more fluent speakers."  We thus do not share the

(continued . . .)

45

The circuit court therefore erred by granting the State's motion for partial summary judgment with respect to Count 2 of Clarabal's complaint.[39]

What constitutes reasonable access is dependent on the totality of the circumstances of this case, and genuine issues of material fact exist as to whether the State has taken all reasonable measures to provide Clarabal's daughters with access to a Hawaiian immersion program.  As with all of the State's constitutional obligations, article X, section 4 places an affirmative duty on the State to fulfil its mandate.  See Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 402, 363 P.3d 224, 250 (2015) (Pollack, J., concurring, in which Wilson, J., joined, and McKenna, J., joined as to Part IV).  The State should thus act with the goal of reviving and preserving

_____

(. . . continued)

dissent's concern and are confident that faithful adherence to the "all reasonable efforts" standard will be a meaningful and necessary component of a Hawaiian education program that is reasonably calculated to revive the Hawaiian language as the framers intended.  See Stand. Comm. Rep. No. 57 in I Proceedings, at 637.

[39]    We decline to reach Clarabal's claims that other constitutional provisions require the State to provide a Hawaiian immersion program on Lāna'i because we hold that any right they may grant is no greater than the reasonable access afforded by article X, section 4.  See State v. Lo, 66 Haw. 653, 657, 675 P.2d 754, 757 (1983) ("[W]e are by no means obliged 'to pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.'" (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))).  With respect to Clarabal's claims related to the alleged teacher shortage, we hold that they are moot, as the evidence indicates that all but two full-time teacher positions were filled at the beginning of the latest school year for which information is included in the record.  We therefore express no opinion as to the merits of these claims.

ʻōlelo Hawaiʻi and the shared culture to which it is inextricably linked when determining whether it is reasonable to take additional steps to provide access to a Hawaiian immersion program. These steps might include providing greater financial or other incentives to attract immersion teachers to Lānaʻi, furnishing transportation for a teacher to commute to Lānaʻi, using multiple instructors to share teaching duties, partnering with community members knowledgeable in ʻōlelo Hawaiʻi, modifying school days or hours of instruction to accommodate the availability of a teacher, or adopting any other alternative method of providing access to a Hawaiian immersion program. Ultimately, all reasonable alternatives are to be considered to determine whether access to a Hawaiian immersion program is feasible, and the State is constitutionally obliged to take a reasonable course of action that would afford access to Clarabal's daughters if any exists. Cf. In re Conservation Dist. Use Application HA-3568, 143 Hawaiʻi 379, 414, 431 P.3d 752, 787 (2018) (Pollack, J., concurring) (requiring a showing of a lack of practicable alternatives to the use of constitutionally protected public trust conservation land).

We therefore affirm the circuit court's denial of Clarabal's motion for partial summary judgment, which requested a declaration that the State has a duty and obligation to provide her daughters with actual access to a Hawaiian immersion

47

program, and remand for a determination of whether the State has taken all reasonable steps to afford Clarabal's daughters access to Hawaiian immersion education in light of the circumstances associated with providing greater accessibility.

## IV. CONCLUSION

A well known Hawaiian proverb states "I ka wā ma mua, ka wā ma hope," or, "In the past, lies the future."[40] The spirit of this adage motivated the framers' adoption of article X, section 4 of the Hawai'i Constitution, which imposes on the State a duty to provide for a Hawaiian education program in public schools that is reasonably calculated to revive the Hawaiian language. Because the evidence in the record demonstrates that providing reasonable access to Hawaiian immersion education is currently essential to reviving the language, it is an essential component of any such program.

We therefore vacate in part the circuit court's June 7, 2016 "Order: (1) Granting Defendants' Motion for Partial Summary Judgment as to Counts 1 and 2 of the Complaint Filed February 26, 2016; (2) Granting Defendants' Motion for Partial Summary Judgment as to Counts 3 and 4 of the Complaint filed

---

[40] Liberty Peralta, PBS Hawai'i, Hōkūle'a Programming (Aug. 2, 2017), https://www.pbshawaii.org/hokulea/ [https://perma.cc/9XX2-URG2]. Literally, "the time in front, . . . the time in back," the phrase has also been translated as "through the past is the future." Natalie Kurashima, Jason Jeremiah, & Tamara Ticktin, I Ka Wā Ma Mua: The Value of a Historical Ecology Approach to Ecological Restoration in Hawai'i, 71 Pac. Sci. 437, 440 (2017).

February 26, 2016; and (3) Denying Plaintiff's Motion for Partial Summary Judgment Filed March 17, 2016." The order is vacated insofar as it granted the State's motion for partial summary judgment with respect to Count 2 of the complaint. The order is affirmed in all other respects. We also vacate the circuit court's June 7, 2016 "Final Judgment Re: Order: (1) Granting Defendants' Motion for Partial Summary Judgment as to Counts 1 and 2 of the Complaint Filed February 26, 2016; (2) Granting Defendants' Motion for Partial Summary Judgment as to Counts 3 and 4 of the Complaint filed February 26, 2016; and (3) Denying Plaintiff's Motion for Partial Summary Judgment Filed March 17, 2016." We remand for a determination of whether, under the circumstances, the State has taken all reasonable measures to provide access to a Hawaiian immersion program to Clarabal's two daughters.

Sharla A. Manley
Camille Kaimālie Kalama
David Kaulia Kopper
for petitioner

Kimberly Tsumoto Guidry
Kalikoʻonalani Fernandes
For respondent

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

